2012 COA 168

SDI, INC., a Colorado corporation,
Plaintiff–Appellee,

v.

PIVOTAL PARKER COMMERCIAL,
LLC, a Delaware corporation,
Defendant–Appellant.

No. 11CA0134.

Colorado Court of Appeals,
Div. IV.

Oct. 11, 2012.

Silver & DeBoskey, P.C., Joe L. Silver, Martin D. Beier, Ruba M. Forno, Denver, Colorado, for Plaintiff–Appellee.

Seter & Vander Wall P.C., Kim J. Seter, Jeffrey E. Erb, Greenwood Village, Colorado; Reutzel & Associates, LLC, Karen V. Reutzel, Littleton, Colorado, for Defendant–Appellant.

Opinion by Judge FURMAN.

¶ 1 In this dispute over the terms of several contracts, defendant, Pivotal Parker Commercial, LLC (Pivotal), appeals the trial court's entry of judgment following a bench trial in favor of plaintiff, SDI, Inc. (SDI). We reverse and remand.

## I. The Stroh Ranch Development

¶ 2 In 1984, the Town of Parker annexed a parcel of undeveloped land known as Stroh Ranch. To facilitate development and construction of public infrastructure within Stroh Ranch, the Town of Parker authorized the formation of the Cherry Creek South Metropolitan District No. 1 (the District) under Colorado's Special District Act, sections 32–1–101 to –1807, C.R.S.2012. One of the District's specific functions was to obtain financing for developing the public infrastructure within Stroh Ranch. To this end, the District entered into a series of Bond Anticipation Notes and Reimbursement Agreements with one of the original developers of Stroh Ranch (later called Stroh Ranch Development, LLC, or SRD). In total, the District incurred an obligation to SRD in a final amount of $11,130,000.

¶ 3 To settle this obligation, the District and SRD entered into the "Seventh Amendment to Restated Reimbursement Letter Agreement Dated June 26, 1989" (Seventh Amendment). The Seventh Amendment was intended to document the final liquidation of all obligations existing between SRD and the District. In paragraph 6 of the Seventh Amendment, the District assigned to SRD "the right to receive, the following revenues that the District would otherwise have received as a result of the District's development of infrastructure within the District, including but not limited to development fees." After entering into the Seventh Amendment, SRD began assessing eight percent interest on the development fee "receivable" assigned to it. The District took no part in determining this amount. SRD later assigned the right to receive development fee revenue to SDI by a purchase and sale agreement.

## II. The SDI–Pivotal Contract

¶ 4 In 2004, SDI, then an owner of certain real property in Stroh Ranch, listed the property for sale and received an offer from

Pivotal. The parties entered into a real estate purchase and sale contract (SDI–Pivotal Contract) for this property, including certain property designated as "Filing Nos. 14 and 15." During negotiations of the SDI–Pivotal Contract, the parties agreed to exclude several assets from the sale. Exhibit L to the SDI–Pivotal Contract listed, as an excluded asset, "The receivable for Development Fees for Filings # 14 and # 15 ... and the balance and records thereof." These development fees were the same fees assigned to SDI through the Seventh Amendment.

¶ 5 Before the SDI–Pivotal Contract closed, SDI, acting under its trade name, AscentPointe Development, Inc., entered into a separate contract (E & T Contract) to sell a parcel of land located within Filing No. 15 (E & T Property), which the buyer assigned to E & T Li, LLC (E & T). Pivotal was aware of, and did not object to, the E & T Contract.

¶ 6 The SDI–Pivotal contract closed in December 2004. Because Pivotal had purchased Filing No. 15, in which the E & T Property was located, SDI then assigned all of its right, title, and interest in the E & T Contract to Pivotal (E & T Contract Assignment). The E & T Contract Assignment did not contain any language excluding the development fees from the assignment.

¶ 7 The E & T Contract closed a few months later. At the closing, Pivotal, as assignee of SDI's rights in the E & T Contract, received the purchase price of $866,162, as well as $24,500 for the cost of water resource tolls and water taps, as set forth in the E & T Contract. Thereafter, E & T obtained a building permit for the E & T Property.

¶ 8 Following the issuance of a building permit to E & T, SDI demanded a development fee for the E & T Property from either E & T or Pivotal. When the development fee was not paid, SDI filed suit against Pivotal and E & T. SDI first sought a declaratory judgment that it was entitled to development fees on Filing Nos. 14 and 15, pursuant to the Seventh Amendment and the SDI–Pivotal Contract. SDI also sought damages, based on a breach of contract, for the development fees on the E & T Property. The

parties stipulated that the development fees had been included as part of the purchase price of the E & T Contract, and E & T was dismissed with prejudice.

¶ 9 Following a bench trial, the trial court entered judgment in favor of SDI. The trial court determined that the development fees were validly assigned to SDI, as authorized by statute; SDI was entitled to add interest, at eight percent per annum, compounded annually, to the amount assigned to it under the Seventh Amendment; and the development fees assigned to SDI, until paid, constituted a perpetual lien that runs with the land. As to SDI's request for damages based on breach of contract, the trial court concluded that Pivotal had breached the SDI–Pivotal Contract by failing to pay the development fee portion of the purchase price of the E & T Contract to SDI. It then awarded damages to SDI in the amount of $358,602.13, plus post judgment interest at eight percent per annum.

### III. Standard of Review

¶ 10 We review a judgment following a bench trial as a mixed question of fact and law. *Lawry v. Palm*, 192 P.3d 550, 558 (Colo.App.2008). "We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record." *Id.* (citing *M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo.1994)). We review the court's conclusions of law de novo. *Id.*

### IV. The Judgment

¶ 11 Pivotal contends the trial court erred in entering judgment in favor of SDI. Pivotal raises three main issues on appeal, contending the trial court erred when it

(1) determined that the District validly assigned its right to receive development fee revenue to SDI, and that SDI was entitled to collect, and charge interest on, that amount;

(2) determined that SDI has a perpetual lien on Filing Nos. 14 and 15; and

(3) concluded that Pivotal breached its contract with SDI.

**1168**

¶ 12 SDI requests an award of appellate attorney fees pursuant to the terms of the SDI–Pivotal Contract.

¶ 13 We address each contention and request in turn.

### A.  Assignment of Development Fees

¶ 14 We first consider whether the trial court erred when it determined that the District validly assigned its right to receive development fee revenue to SDI, and that SDI was entitled to collect, and charge interest on, that amount.  We conclude that it did.

#### 1.  Special District Act

¶ 15 The trial court's determination rested in part on its interpretation of the Special District Act. As relevant here, the trial court concluded:

> Since the Special District Act grants broad powers to special districts but is silent as to the effect of assignments, this Court must look to the common law to determine if SDI was entitled to take the place of the District and do that which the District was not barred from doing.

¶ 16 We first note that the trial court erred in concluding it must look to common law to fill-in the statutory silence in section 32–1–1001(1), C.R.S.2012, which defines a special district's common powers. Special districts are creatures of statute and, as such, "may only exercise those powers that are expressly conferred or exist by necessary implication." *South Fork Water & Sanitation Dist. v. Town of South Fork*, 252 P.3d 465, 469 (Colo.2011). Though we liberally construe the Special District Act "to effect its purposes," *see* § 32–1–113, C.R.S. 2012, we cannot read powers into the statute which are neither expressly enumerated nor necessarily implied, *see id.; see also City of Aurora v. Bogue*, 176 Colo. 198, 200–01, 489 P.2d 1295, 1296 (1971)(noting that doubts as to the existence of the entity's power must be resolved against the entity).

¶ 17 Because we review the trial court's conclusions of law de novo, *Lawry*, 192 P.3d at 558, we now turn to the question of whether section 32–1–1001(1) provides the District with the power to assign its right to receive revenue to a private party.  We conclude it does not.

¶ 18 Statutory interpretation is a question of law that we review de novo. *Fischbach v. Holzberlein*, 215 P.3d 407, 409 (Colo.App.2009).  To determine the meaning of a statute, we "first look to the plain language of the statute." *Douglas Cnty. Bd. of Equalization v. Clarke*, 921 P.2d 717, 721 (Colo.1996).  If the statute is unambiguous, we look no further. *Devora v. Strodtman*, 2012 COA 87, ¶ 10, 282 P.3d 528, 531.

¶ 19 Section 32–1–1001(1) is unambiguous. It provides special districts with the following authority.

> (d) (1) To enter into contracts and agreements affecting the affairs of the special district except as otherwise provided in this Part 10. . . .
>
> . . . .
>
> (j)(I) To fix and from time to time to increase or decrease fees, rates, tolls, penalties, or charges for services, programs, or facilities furnished by the special district. . . . The board may pledge such revenue for the payment of any indebtedness of the special district.  Until paid, all such fees, rates, tolls, penalties, or charges shall constitute a perpetual lien on and against the property served, and any such lien may be foreclosed in the same manner as provided by the laws of this state for the foreclosure of mechanics' liens.
>
> . . . .
>
> (n) To have and exercise all rights and powers necessary or incidental to or implied from the specific powers granted to special districts by this article.  Such specific powers shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent of this article.

¶ 20 Under the plain language of the statute, we conclude that the District has no specific power to assign its right to receive development fee revenue.  We arrive at this conclusion for two reasons.  First, the Special District Act gives the District the specific power to "pledge such revenue for the payment of any indebtedness of the special dis-

trict." § 32 –1–1001(1)(j)(I), C.R. S 2012. This power, however, is not synonymous with, nor does it have the same legal effect as, the power to assign the right to receive revenue.

¶ 21 The plain meaning of the word "pledge," as it is used in the statute, is a formal promise or undertaking. *See Black's Law Dictionary* 1272 (9th ed. 2009). Thus, we interpret the plain language of section 32–1–1001(1)(j)(I) to empower a district to promise to devote the district's revenue, as received, to the payment of the district's indebtedness, rather than to another purpose. *See Black's Law Dictionary* 1272; *cf.*, *e.g.*, § 32–9–131, C.R.S.2012 (explaining the legal effect of pledging revenue in another context). In contrast, the word "assign" carries a different meaning. *See, e.g., Farmers Acceptance Corp. v. DeLozier*, 178 Colo. 291, 294, 496 P.2d 1016, 1018 (1972) ("It is a general rule that an assignee of contract rights stands in the shoes of the assignor . . . ."); *see also* Restatement (Second) of Contracts § 317(1) (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance."). Thus, the plain meaning and legal effect of a pledge are different from the meaning and legal effect of an assignment. The statutory terms are not interchangeable. *See People v. Jaramillo*, 183 P.3d 665, 671 (Colo.App.2008)("[W]e 'respect the legislature's choice of language' and 'do not add words to the statute or subtract words from it.'") (citation omitted) (quoting in part *Turbyne v. People*, 151 P.3d 563, 567–68 (Colo. 2007)).

¶ 22 Second, the power to assign the right to receive development fee revenue is not necessary or incidental to, or implied from, the specific powers granted in the Special District Act. *See* § 32–1–1001(1)(n). The power to assign the right to receive development fee revenue would be a separate and additional power, wholly distinct from the exercise of the District's specific powers. *See id.* Thus, even though the District possesses the rights "necessary or appropriate to carry out the purposes and intent of" the Special District Act, *id.*, "such powers may not be used to go beyond the express powers granted," *Haggerty v. Poudre Health Services Dist.*, 940 P.2d 1105, 1109 (Colo.App. 1997). As we have concluded, those powers do not include the power to assign the right to receive revenue.

### 2. Seventh Amendment Provisions

██ ¶ 23 In light of our interpretation of section 32–1–1001(1) of the Special District Act, we next consider whether paragraph 6 of the Seventh Amendment went beyond the scope of the District's statutory and constitutional powers. We conclude that it did.

██ ¶ 24 Contract interpretation is a question of law that we review de novo. *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo.2000). We consider written contracts that are complete and free from ambiguity to express the intention of the parties, and we will enforce these contracts according to their plain language. *Id.* Absent an ambiguity, "we will not look beyond the four corners of the agreement to determine the meaning intended by the parties." *Id.* at 376–77.

¶ 25 Paragraph 6 of the Seventh Amendment reads, in pertinent part:

6. *Assignment of Development Fee Revenues.* The parties acknowledge and agree that the District shall assign to Stroh, and Stroh shall have the right to receive, the following revenues that the District would have otherwise received as a result of the District's development of infrastructure within the District, including but not limited to development fees, . . . and that the amount that Stroh shall be considered as having received pursuant to said assignment, whether actually received or not, is a cumulative total of $9,882,463; provided that the timing and actual receipt of said revenues [are] in part uncertain.

¶ 26 The plain language of paragraph 6 of the Seventh Amendment purports to assign the District's right to collect and receive revenue to SDI. Under this paragraph SDI would stand in the shoes of the District, giving SDI the District's legal rights vis-à-vis

the receipt of the development fee revenue. *See Farmers Acceptance Corp.,* 178 Colo. at 294, 496 P.2d at 1018.

¶ 27 Though the trial court appears to have similarly interpreted the Seventh Amendment, it also found that the District's assignment to SDI in the Seventh Amendment was "valid as authorized by statute." We conclude, however, that this purported assignment went beyond the District's statutory and constitutional powers and the trial court erred in concluding otherwise. This is so for two reasons.

¶ 28 First, paragraph 6 of the Seventh Amendment purports to allow SDI to exercise powers which are beyond the scope of those conferred on the District by the Special District Act. *See* § 32–1–1001(1). As we have previously discussed, the Special District Act does not specifically provide for, nor does it necessarily imply, a power to assign a special district's right to receive revenue. *See id.*

¶ 29 Second, paragraph 6 of the Seventh Amendment requires a private party to undertake strictly legislative functions. *See, e.g., Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver,* 928 P.2d 1254, 1268 (Colo.1996).

¶ 30 The prohibition of the delegation of legislative functions to private parties is a long-standing legal principle in this state. *See Fellows v. LaTronica,* 151 Colo. 300, 305–06, 377 P.2d 547, 550 (1962). Article V, section 35 of the Colorado Constitution states:

> The general assembly shall not delegate to any special commission, private corporation[,] or association, any power to make, supervise[,] or interfere with any municipal improvement, money, property[,] or effects, whether held in trust or otherwise, or to levy taxes or perform any municipal function whatever.

¶ 31 "The design and purpose of this section is to prohibit the delegation to private corporations of the exercise of powers strictly governmental...." *In re House,* 23 Colo. 87, 94, 46 P. 117, 119 (1896). The sound reason behind this rule is the maxim that the government should be accountable through the political process for the decisions that affect its constituents. *See Fellows,* 151 Colo. at 304, 377 P.2d at 550 ("The duly elected representatives of all the people who are chosen to function in a legislative or executive capacity cannot abdicate or bargain away the continuing responsibility which rests upon such representatives to exercise their official judgment in transacting the public business committed to their care.").

¶ 32 By allowing SDI to collect development fees at the rate the District set at the time of the Seventh Amendment and to add eight percent interest to account for the time value of money, the District attempted to contract away its power to "fix and from time to time [ ] increase ... fees." *See* § 32–1–1001(1)(j)(I). Determining the amount of fees is a legislative function which cannot be delegated, and, by extension, contracted away, to a private party. *See Bennett Bear Creek Farm Water & Sanitation Dist.,* 928 P.2d at 1269–70 ("Contracts of a governmental entity cannot divest its legislative powers ...."); *see also Krupp v. Breckenridge Sanitation Dist.,* 19 P.3d 687, 693–94 (Colo. 2001)(plant investment fee charged by sanitation district was a service fee properly imposed under § 32–1–1001(1)(j)(I)).

¶ 33 Because the Seventh Amendment is beyond the scope of the District's statutory and constitutional powers, we conclude that paragraph 6 of the Seventh Amendment is void, and the trial court erred when it determined that the District validly assigned its right to receive development fee revenue to SDI, and that SDI was entitled to collect, and charge interest on, that amount. *See Black v. First Federal Sav. & Loan Ass'n,* 830 P.2d 1103, 1109 (Colo.App.1992)("[I]f a special district's contract is beyond the scope of its constitutional or statutory powers, the contract is *ultra vires* and, consequently, void."), *aff'd,* 857 P.2d 410 (Colo.1993).

### B. The Perpetual Lien

¶ 34 We next consider whether the trial court erred when it declared that SDI has a perpetual lien on Filing Nos. 14 and 15. We conclude that it did.

¶ 35 In its order, the trial court stated:

The Special District Act does not limit the perpetual lien rights on development fees to run in favor of a governmental entity only. To the contrary, the statute acknowledges that the District could pledge the fees to a private entity for payment of its debt. The fact that the perpetual lien language follows the right to pledge the fees to another indicates that the perpetual lien right is concomitant with the pledge. It would be illogical to grant the . . . District the power to pledge or assign a revenue stream, but not likewise give the pledgee or assignee the mechanism needed to collect—i.e., the lien used to foreclose if payment is refused. Thus, the Court finds that the development fees assigned to SDI, until paid, constitute a perpetual lien that run with the land, and that the . . . District assigned its lien rights when it assigned the development fees.

¶ 36 The trial court erred in determining that SDI has a perpetual lien on Filing Nos. 14 and 15 pursuant to the assignment in the Seventh Amendment because, as we have concluded above, the District was not empowered by the Special District Act to assign, and, therefore, could not assign, the right to receive future development fees to SDI. Section 32–1–1001(1)(j)(I) states that special districts may "fix and from time to time to increase or decrease fees" and that "[u]ntil paid, all such fees . . . shall constitute a perpetual lien on and against the property served." Since the perpetual lien is only constituted by unpaid development fees imposed by the District, and the District could not assign development fees to SDI, SDI was not assigned a perpetual lien on Filing Nos. 14 and 15.

### C. Breach of Contract

¶ 37 We also consider whether the trial court erred when it concluded that Pivotal breached its contract with SDI. We conclude that it did.

¶ 38 The SDI–Pivotal contract contains no language providing that SDI is entitled to a portion of the purchase price of the E & T Contract as development fees.

¶ 39 Further, the E & T Contract described the purchase price for E & T Property as follows:

The purchase price for the [E & T Property] shall be Eight Hundred Sixty–Six Thousand One Hundred Sixty–Two and No/ 100 Dollars ($866,162.00) (the "Purchase Price"). In addition to the Purchase Price, Buyer shall pay to Seller the cost of the water resource toll and water taps . . . .

¶ 40 In addition, the E & T Contract Assignment from SDI to Pivotal reads in pertinent part:

Assignor hereby assigns, sets over[,] and transfers to Assignee all of Assignor's right, title[,] and interest in, to[,] and under the [E & T Contract].

¶ 41 Thus, neither the SDI–Pivotal Contract, nor the E & T Contract, nor the E & T Contract Assignment provides that Pivotal must transfer a portion of the purchase price of the E & T Contract to SDI as development fees. On the contrary, under the E & T Contract, before it was assigned, SDI had a right to the full purchase price of $866,162. In the E & T Contract Assignment, SDI assigned all of its rights under the E & T Contract to Pivotal, including all of its rights to the purchase price.

¶ 42 Although SDI argues that it is entitled to the development fees because of their assignment to SDI in the Seventh Amendment, as we have concluded above, the District was not empowered by the Special District Act to assign the right to receive future development fees to a private party such as SDI.

### V. Attorney Fees

¶ 43 Because we reverse the trial court's final judgment in favor of SDI, we deny SDI's request for an award of appellate attorney fees.

¶ 44 The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

Judge WEBB and Judge RUSSEL concur.