2014 CO 80

**SDI, INC., a Colorado corporation,**
**Petitioner,**

v.

**PIVOTAL PARKER COMMERCIAL,**
**LLC, a Delaware limited liability**
**company, Respondent.**

**Supreme Court Case No. 12SC870**

Supreme Court of Colorado.

December 8, 2014

Attorneys for Petitioner: Silver & DeBoskey, A Professional Corporation, Joe L. Silver, Martin D. Beier, Denver, Colorado.

Attorneys for Respondent: Seter & Vander Wall P.C., Kim J. Seter, Jeffrey E. Erb, Greenwood Village, Colorado.

Attorneys for Amicus Curiae Special District Association of Colorado: Special District Association of Colorado, Ann A. Terry, Denver, Colorado, Kutak Rock LLP, Neil L. Arney, Mia K. Della Cava, Denver, Colorado.

JUSTICE EID delivered the Opinion of the Court.

¶ 1 In this case, we consider whether the Special District Act (the "Act"), sections 32–1–101 to –1807, C.R.S. (2014), gives special districts the power to assign to a private party the right to receive development fees. Here, Cherry Creek South Metropolitan District # 1 ("the District") assigned to a predecessor-in-interest of petitioner SDI, Inc. ("SDI") the right to receive fees that the District had assessed upon developers within its boundaries to finance the development of municipal infrastructure. The District had increased these development fees by about four percent in each of the years prior to the assignment. SDI also increased the fees it collected, but at a rate of eight percent per year. SDI brought an action against respondent Pivotal Parker Commercial, LLC ("Pivotal"), seeking to recover unpaid development fees and requesting a declaratory judgment that it was entitled to the fees, as increased annually, in the future.

¶ 2 The trial court determined that SDI was entitled to receive the fees as increased annually, rejecting Pivotal's argument that the fee increase amounted to an improper delegation of legislative authority. On appeal, Pivotal again argued that the fee increase constituted an improper delegation of legislative authority. The court of appeals reversed the trial court. The court concluded that the District had no authority to assign fee revenue in the first place, an argument not raised by the parties or presented to the trial court. *SDI, Inc. v. Pivotal Parker Commercial, LLC,* 2012 COA 168, ¶ 17, 292 P.3d 1165. More specifically, it held that because the Act expressly authorizes special districts to "pledge" revenue under section 32–1–1001(1)(j)(I), and because an assignment differs from a pledge, the Act necessarily precludes districts from assigning revenue. *Id.* at ¶¶ 20–22.

¶ 3 We now reverse. We conclude that the reasoning of the court of appeals is contrary to the Act itself, which states that "specific powers shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent" of the Act. § 32–1–1001(1)(n). Thus, the express power to pledge does not, by itself, restrict the power to assign. We hold that the power to assign revenue falls within another express power given to districts, namely, the power to "dispose of . . . real and personal property." § 32–1–1001(1)(f). The District's assignment of the right to collect development fee revenue was therefore a lawful exercise of its statutory authority. Accordingly, we reverse the court of appeals' holding to the contrary and remand to the court of appeals for consideration of the other issues raised by Pivotal on appeal, including whether SDI was entitled to increase the fees.

I.

¶ 4 In 1984, the town of Parker annexed a parcel of undeveloped land known as Stroh Ranch. The town then formed the District under the Act to facilitate development of the parcel. To raise revenue for developing public infrastructure, the District assessed a de-

velopment fee at a specified amount per acre upon developers of property within its boundaries. The development fee would be due when the developer obtained a building permit for its property. Realizing that it might not be able to collect these fees for many years, and in recognition of the time value of the money, the District forecasted that these development fees would increase annually at a steady rate of two percent from 1986 to 2019. In practice, however, the development fees increased each year from 1996 to 1999 at a rate of about four percent.

¶ 5 The District also financed development of Stroh Ranch by borrowing millions of dollars from Stroh Ranch Development, LLC ("SRD"), one of Stroh Ranch's original developers. The District and SRD entered into a reimbursement agreement in June 1989, under which the District pledged the revenue it would receive from development fees to pay back its debts to SRD. This contractual relationship between the District and SRD endured over the course of several years and through six amended versions of the reimbursement agreement.

¶ 6 The District and SRD eventually entered into a seventh amended reimbursement agreement. In this Seventh Amendment, the District assigned to SRD the right to receive various "revenues that the District would otherwise have received as a result of the District's development of infrastructure within the District, including but not limited to development fees." In exchange for this assignment, the Seventh Amendment reduced the amount that the District owed to SRD by the value of these revenues. Documents which accompanied drafts of the amended agreement show that the District and SRD calculated the value of the development fees SRD would collect by using specific per-acre rates comparable to the rates in effect at that time. The Seventh Amendment was silent as to whether SRD could increase the development fees.

¶ 7 The agreement was submitted to the District's board of directors in a special meeting in January 2000, at which the board approved of the agreement and authorized its execution. The board also held a regular meeting a week later, for which notice to the public was provided and at which members of the public were present. At the regular meeting, the amended agreement was again discussed and the minutes of the special meeting were reviewed and approved. That same year, SRD began collecting the development fees. SRD's manager later testified that there was no agreement between SRD and the District regarding the accrual of interest or the rate at which the development fees would increase. In the absence of any such agreement, SRD increased the development fees by eight percent each year, the statutory rate of interest, as calculated from the date of the assignment. See § 5–12–102(2), C.R.S. (2014).

¶ 8 SDI, the petitioner in this case, later acquired SRD's rights to receive the development fees, along with other real property within the District. SDI then entered into a contract to sell part of its property in Stroh Ranch to Pivotal, the respondent in this case. To lower the sale price, the contract specifically excluded several assets from the transaction, such as the right to receive the development fees that the District had assigned to SRD for property included in the sale.

¶ 9 Before the contract between SDI and Pivotal closed, and with Pivotal's consent, SDI sold one of the lots within the property being transferred to Pivotal to E & T Li, LLC. SDI assigned its rights under its contract with E & T Li to Pivotal when the SDI–Pivotal contract closed. Once the E & T Li contract closed some time later, E & T Li obtained a building permit for its lot. SDI then brought suit against both E & T Li and Pivotal, seeking payment for the development fees for the E & T Li property and a declaratory judgment that it would be entitled to payments for the development fees for Pivotal's remaining property in the future. The parties eventually stipulated that the price of E & T Li's contract for the purchase of its property included satisfaction of the development fees, and E & T Li was dismissed with prejudice.

¶ 10 Following a bench trial, the trial court determined that the District's assignment of the development fees constituted a "mutual settlement of accounts" under section 5–12–102(2), and that therefore, because there was

"no agreement as to the rate" of interest to be charged on the debt, SDI was entitled to collect the statutory eight percent interest rate. *See* § 5–12–102(2) ("When there is no agreement as to the rate thereof, creditors shall be allowed to receive interest at the rate of eight percent ... for all moneys ... or money due on mutual settlement of accounts from the date of such settlement...."). The trial court rejected Pivotal's argument that SDI was not entitled to add interest to the assigned development fees because the charging of interest constituted a legislative function that could not be delegated. SDI did not challenge, nor did the trial court consider, the authority of the District to assign the fee revenue in the first instance. In its order, the trial court used the term "pledge" and "assign" interchangeably.

¶ 11 Allowing for this eight percent interest raised the value of the development fee for the E & T Li lot from $155,536.51, its value at the time of the assignment in January 2000, to $358,602.13, which the trial court awarded to SDI as damages for Pivotal's breach of contract. The increase also raised the value of the remaining development fees to be paid to SDI from $1,909,206.39 to $4,379,578.19, not including the eight percent interest to be added each year from the date of the trial court's ruling until the fees were paid. In two subsequent orders, the trial court also awarded SDI attorneys' fees in the amount of $544,976.92 and costs in the amount of $22,000.33 pursuant to the prevailing party provision in the SDI–Pivotal contract.

¶ 12 On appeal, Pivotal argued, inter alia, that SDI could not increase the assigned fees because that was a legislative function that could not be delegated. The court of appeals reversed the trial court, concluding that the Act did not give the District the authority to assign its right to receive revenue in the first instance. The court reasoned that because the Act expressly authorizes special districts to "pledge" revenue under section 32–1–1001(1)(j)(I), and because an assignment is different from a pledge, the Act necessarily precludes districts from assigning revenue. *SDI, Inc.,* ¶¶ 20–21. Nor, the court further held, was the power to assign the right to receive revenue "necessary or incidental to or implied from the specific powers granted" in the Act under section 32–1–1001(n). *Id.* at ¶ 22. The court of appeals therefore determined that the attempted assignment was void in its entirety. *Id.* at ¶ 33.[1]

¶ 13 In a separate appeal, a different division of the court of appeals vacated the trial court's order awarding SDI attorneys' fees and costs. Relying on the reversal of the underlying judgment in favor of SDI, this division remanded the case to the trial court for determination of the prevailing party and awarding of attorneys' fees and costs. *SDI, Inc. v. Pivotal Parker Commercial, LLC,* No. 11CA1427, slip op. at 1, 2012 WL 4827863 (Colo. App. Oct. 11, 2012). SDI petitioned this court for review of both opinions.[2] We consolidated the cases and now review them together.

## II.

¶ 14 This case requires us to consider whether the District had authority to assign

---

1. The court briefly addressed Pivotal's argument that SDI could not increase or charge interest upon the fees, as doing so would amount to performing a legislative function that could not be delegated. *See id.* at ¶ 32 ("By allowing SDI to collect development fees at the rate the District set at the time of the Seventh Amendment and to add eight percent interest to account for the time value of money, the District attempted to contract away its power to 'fix and from time to time [] increase ... fees.' *See* § 32–1–1001(1)(j)(I). Determining the amount of fees is a legislative function which cannot be delegated, and, by extension, contracted away, to a private party.").

2. We granted certiorari to review the following issues:
   1. Whether the court of appeals erred in holding that the Special District Act does not empower districts to assign their assets to pay off district indebtedness.
   2. Whether the court of appeals exceeded the proper scope of appellate review in determining the effect of a contract in a manner contrary to the stipulations and understandings of the parties, based on arguments never raised at trial or on appeal, in the absence of any extraordinary circumstances.
   3. Whether the prevailing party attorneys' fees awarded to SDI should be reinstated.

the right to receive the development fees. We hold that the Special District Act, which gives special districts the power to dispose of their property, expressly authorizes the assignment of the right to receive future revenue.

## A.

¶ 15 The question of whether the Act authorizes the District's assignment of fee revenue is one of statutory construction that we review de novo. *Colo. Dep't of Revenue v. Hibbs,* 122 P.3d 999, 1002 (Colo. 2005).

¶ 16 The General Assembly enacted the Special District Act with the intent that special districts would "promote the health, safety, prosperity, security, and general welfare" of their inhabitants and of the state of Colorado. § 32–1–102(1). As creatures of statute, special districts "possess only those powers expressly conferred on them by the constitution or statute, as well as the incidental implied powers reasonably necessary to carry out the express powers." *South Fork Water & Sanitation Dist. v. Town of South Fork,* 252 P.3d 465, 468–69 (Colo. 2011). Because the Act is "necessary to secure the public health, safety, convenience, and welfare," however, its provisions are to be "liberally construed to effect its purposes." § 32–1–113.

¶ 17 One of the special district's expressly granted powers is the authority "[t]o fix and from time to time to increase or decrease fees, rates, tolls, penalties, or charges for services, programs, or facilities furnished by the special district." § 32–1–1001(1)(j)(I). In addition, special districts "may *pledge* such revenue for the payment of any indebtedness of the special district." *Id.* (emphasis added). The court of appeals reasoned that under the plain statutory language, a special district is only empowered to pledge such revenue, not assign it. *SDI, Inc.,* ¶ 20. From this, the court of appeals concluded that the assignment in this case was void.

¶ 18 We find the court of appeals' reasoning to be flawed. Although the court correctly pointed out that a pledge is not equivalent to an assignment,[3] it erroneously concluded that the express power to pledge necessarily acts as a limitation on the power to assign. Indeed, the Act, by its own terms, rejects the court of appeals' rationale that the authorization of a particular power acts as a limitation on other powers. Section 32–1–1001(1)(n) states: "Such specific powers [enumerated in the preceding sections of the Act] shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent of this article." In other words, the express powers enumerated in the Act should be interpreted as empowering a district to act, not as a limitation on a district's authority to act that might be found elsewhere in the statute. Applying this instruction here, the fact that the Act expressly empowers special districts with authority to pledge revenue does not, in and of itself, negate the authority to assign revenue.

¶ 19 We must still determine, however, whether the authority to assign revenue is found elsewhere within the Act. The court of appeals did not discuss the possible application of section 32–1–1001(1)(f), which authorizes special districts to "acquire, dispose of, and encumber real and personal property." SDI argues that an assignment of the right to receive revenue is the "dispos[ition] of" property under section 32–1–1001(1)(f). We agree.

¶ 20 Pivotal argues that the statutory language "real and personal property" is limited to "tangible things," and that, because the right to receive revenue in the future is not a tangible thing, it cannot fall within section 32–1–1001(1)(f). As we have previously held, however, the term "property" is a broad term used to describe "whatever is the subject of legal ownership," includ-

---

3. While a pledge of revenue simply promises to deliver revenue once it is received, an assignment does more, transferring the assignor's rights and duties to the assignee and placing the assignee in the assignor's shoes. *Farmers Acceptance Corp. v. DeLozier, 178* Colo. 291, 294, 496

P.2d 1016, 1018 (1972). *Compare also Black's Law Dictionary* 1272 (9th ed. 2009) (defining "pledge" as "[a] formal promise or undertaking"), *with id.* at 136 (defining "assignment" as a "transfer of rights or property").

ing "physical things, such as lands, goods, [or] money," and *"intangible things,* such as franchises, patent rights, copyrights, trade-marks, trade-names, business good will, rights of action, etc." *Las Animas Cnty. High Sch. Dist. v. Raye,* 144 Colo. 367, 371, 356 P.2d 237, 239 (1960) (emphasis added). Real property is, of course, tangible, but the term "personal property" covers both tangible and intangible personal property. Indeed, it includes everything that is subject to ownership, tangible and intangible, that is not real property. *See, e.g., Black's Law Dictionary* 1337 (defining "personal property" as "any movable or intangible thing that is subject to ownership and not classified as real property"); § 39–1–102(11), C.R.S. (2014) (defining the term "personal property" for purposes of the tax code as "everything that is the subject of ownership and that is not included within the term 'real property' "); *In re Paulsen's Estate,* 113 Colo. 373, 384, 158 P.2d 186, 191 (1945) ("A bequest of 'personal property' includes every form of personal property ... except real property. It includes credits, savings-bank deposits, notes, [and] bonds...."). The right to receive revenue in the future is a form of intangible personal property. *See, e.g., In re Marriage of Grubb,* 745 P.2d 661, 665 (Colo. 1987) (holding that vested but unmatured pension plan was subject to marital property division because "a right to receive payment at some time in the future" is "a form of property"). Here, we conclude that the right to receive development fees in this case is a form of intangible personal property that falls within section 32–1–1001(1)(f).

¶ 21 Further, we conclude that assignment of property is a form of "dispos[ition] of" property under section 32–1–1001(1)(f). One way to "dispose of" property is through an assignment of property rights. *Compare Black's Law Dictionary* 539 (defining a "disposition" as an "act of transferring something to another's care or possession," or a "relinquishing of property"), *with id.* at 136 (defining an "assignment" as a "transfer of

rights or property"). It is "a well settled principle," moreover, "that the right to receive money due or to become due ... may be assigned...." *Farmers Acceptance Corp. v. DeLozier,* 178 Colo. 291, 294, 496 P.2d 1016, 1017 (1972). The power to "dispose of" property under section 32–1–1001(1)(f) therefore includes the authority to assign a right to receive future revenue. In sum, the District's assignment of its right to receive future development fees was expressly authorized by section 32–1–1001(1)(f).

¶ 22 In this case, the authority to assign the right to receive future revenue pursuant to section 32–1–1001(1)(f) allowed the District to wind up a decade-long debtor-creditor relationship defined by an agreement that had already undergone six amendments. If the Act required the District to continue to receive the development fees and deliver them to its creditor rather than assign the right to collect the revenue outright, the District's dealings with its creditor and its burden of debt could have lasted for many more years. In fact, at the time of the trial court's judgment in this case, over twenty years had passed since the District and SRD entered into their first reimbursement agreement, yet millions of dollars of fees still remained outstanding. But we see no such intent in the language of the statute. Instead, we find that section 32–1–1001(1)(f) permitted the District to "dispose of" its property interest in receiving future development fees through assignment.[4]

¶ 23 In sum, we conclude that the Act expressly authorized the District to "dispose of" its right to collect future revenue in the form of development fees.

**B.**

█ ¶ 24 In its appeal to the court of appeals, Pivotal's primary argument was that SDI could not increase or charge interest upon the fees, as doing so would amount to performing a legislative function that could not be delegated. The court of appeals' opin-

---

**4.** Pivotal argues that because section 32–1–1001(1)(j)(I) only allows a special district to pledge revenue, it creates a right to receive the revenue in the first instance, and that therefore any assignment of the right to receive revenue in

the future would violate nondelegation principles. We reject this argument on the ground that it is premised on Pivotal's erroneous interpretation of the Special District Act as only allowing a pledge of revenue, which we reject.

ion contains only a passing reference to this argument, which appears after its determination that the District lacked the authority to assign the fees in the first instance. *See SDI, Inc.,* ¶ 32 ("By allowing SDI to collect development fees at the rate the District set at the time of the Seventh Amendment and to add eight percent interest to account for the time value of money, the District attempted to contract away its power to 'fix and from time to time [ ] increase . . . fees.' *See* § 32–1–1001(1)(j)(I). Determining the amount of fees is a legislative function which cannot be delegated, and, by extension, contracted away, to a private party."). The Seventh Amendment is silent as to whether the fees could be increased or whether such fees would accrue interest, however, and the court of appeals performed no analysis to determine the extent, scope, or propriety of the assignment in this regard. Thus, we conclude that the court's statement regarding fee increases and interest must rest entirely upon its erroneous statutory analysis regarding the power to assign revenue in the first instance, which we reverse. Similarly, the division of the court that reversed the

trial court's award of attorneys' fees to SDI based its ruling on this erroneous statutory analysis. *SDI, Inc.,* slip op. at 1. Accordingly, we reverse both courts of appeals' decisions in their entirety.[5] We do not address the question of whether SDI could increase or charge interest upon the fees, as that issue has not been briefed before us, and instead leave that issue for the court of appeals to consider on remand, along with the other appellate issues raised by Pivotal, including the question of attorneys' fees.

### III.

¶ 25 For reasons stated above, we reverse the court of appeals' decisions and remand for further proceedings consistent with this opinion.

---

5. Because we reverse both decisions in their entirety, it is unnecessary for us to consider the second question upon which we granted certiorari involving the scope of the court of appeals' appellate review.