2015 COA 97

**ASPEN SPRINGS METROPOLITAN DISTRICT, Petitioner–Appellee,**

v.

**Stephen KENO, Respondent–Appellant.**

**Court of Appeals No. 13CA2362**

Colorado Court of Appeals,
Div. IV.

Announced July 16, 2015

Rehearing Denied August 6, 2015

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2014.

Colorado Animal Law, LLC, Katherine A. Burke, Durango, Colorado, for Petitioner–Appellee

Richard L. Emmett, Durango, Colorado; Law Office David G. Cox, David G. Cox, Columbus, Ohio, for Respondent–Appellant

Opinion by JUDGE MILLER

¶ 1 Stephen Keno appeals the district court's judgment declaring that Aspen Springs Metropolitan District (Aspen Springs) can regulate the use of property Aspen Springs owns; finding that Aspen Springs has standing to bring a declaratory judgment action; and declaring that Colorado's Fence Law, specifically section 35–46–102, C.R.S.2014, does not authorize willful trespass on Aspen Springs' property. Keno also challenges the scope of the permanent injunction entered against him and appeals portions of an order finding him in contempt and awarding Aspen Springs its costs and attorney fees as a contempt sanction. We affirm the district court's judgment and vacate the portion of the contempt order imposing attorney fees and costs against Keno.

¶ 2 As a matter of apparent first impression in Colorado, we hold that a special or metropolitan district may regulate the use of and access to property it owns.

I. Background

¶ 3 The case arises from a disagreement over grazing by a flock of sheep. For some time, Keno has maintained the flock and grazed it on a parcel of land known as the "Greenbelt." Aspen Springs owns the Greenbelt (which runs through portions of Aspen Springs' district), and has constructed on it a pavilion, a horseshoe pit, a volleyball court, and a disc golf or "frolf" course. In 2011, the Aspen Springs Metropolitan District Board passed a resolution prohibiting the grazing or tethering of livestock on the Greenbelt without the board's prior, written permission.

1. The Fence Law defines a "lawful fence" as "a well-constructed three barbed-wire fence with substantial posts ... sufficient to turn ordinary horses and cattle, ... or any other fence of like efficiency." § 35–46–101(a), C.R.S.2014.

2. At oral argument, Keno for the first time sought to support this argument by referring to materials not in the record (copies of which have

¶ 4 Nonetheless, Keno continued to graze his flock on the Greenbelt. Keno did so intentionally, taking the position that the Fence Law gave him the right to graze his sheep anywhere that is not enclosed by a lawful fence.[1] The continued grazing caused concern within the Aspen Springs community, as the sheep were damaging the Greenbelt and neighboring properties.

¶ 5 After the parties failed to resolve the issue through mediation, Aspen Springs sought (1) a declaratory judgment that Colorado's Fence Law prohibits Keno from grazing his animals on the Greenbelt and (2) an injunction prohibiting the grazing. The district court preliminarily enjoined Keno from grazing his sheep on the Greenbelt. Keno nonetheless continued to pasture his sheep on the Greenbelt and had twice been found in contempt by the time the court issued its final judgment. The final judgment declared that the Fence Law protects Aspen Springs from willful trespass, even though the Greenbelt is not enclosed by a lawful fence, and it permanently enjoined Keno from causing or allowing his animals to wander outside his own property and graze the Greenbelt.

II. Aspen Springs Has Authority to Regulate the Use of Property it Owns

¶ 6 Keno contends that, as a special district and creature of statute, Aspen Springs lacks authority to regulate the use of property it owns.[2] We disagree.

A. Standard of Review

¶ 7 Whether Aspen Springs has statutory authority to regulate property it owns is a question of statutory construction we review de novo. See SDI, Inc. v. Pivotal Parker Commercial, LLC, 2014 CO 80, ¶ 15, 339 P.3d 672. When construing a statute, an appellate court seeks to effectuate the intent of the General Assembly; this objective re-

not been provided to this court or to counsel for Aspen Springs) and asking us to take judicial notice of them. In doing so, Keno asserted issues not raised in the district court. We decline to consider these materials and issues. See Robinson v. Colo. State Lottery Div., 179 P.3d 998, 1008 (Colo.2008); see also CRE 201.

quires that we consider the plain meaning of the statutory language within the context of the statute as a whole. *Bly v. Story*, 241 P.3d 529, 533 (Colo.2010). We analyze the entire statutory scheme to give consistent, harmonious, and sensible effect to all of its parts, *id.*; *Qwest Corp. v. Colo. Div. of Prop. Taxation*, 2013 CO 39, ¶ 16, 304 P.3d 217, and to avoid any interpretation that would lead to an absurd result. *Crandall v. City & Cnty. of Denver*, 238 P.3d 659, 662 (Colo. 2010). The Special District Act, sections 32–1–101 to –1807, C.R.S.2014, must be construed liberally to effect its purposes. § 32–1–113, C.R.S.2014; *SDI, Inc.,* ¶ 16.

### B. Powers of Special Districts

¶ 8 The Special District Act was enacted with the intent that special districts would " 'promote the health, safety, prosperity, security, and general welfare' " of their inhabitants and of the people of Colorado. *SDI, Inc.,* ¶ 16 (quoting § 32–1–102(1), C.R.S. 2014). To this end, special districts have specific powers expressly conferred by the constitution or statute. *See S. Fork Water & Sanitation Dist. v. Town of S. Fork*, 252 P.3d 465, 468 (Colo.2011). Special districts also "have and exercise all rights and powers necessary or incidental to or implied from the specific powers granted to special districts by [the Special District Act]." § 32–11001(1)(n), C.R.S.2014; *see S. Fork,* 252 P.3d at 468–69 (special districts have those incidental and implied powers reasonably necessary to carry out express powers); *Romer v. Fountain Sanitation Dist.,* 898 P.2d 37, 41 (Colo.1995). Express "powers shall not be considered as a limitation upon any power necessary or appropriate to carry out the purposes and intent of [the Special District Act]." § 32–1–1001(1)(n); *see SDI, Inc.,* ¶ 18 ("[T]he express powers enumerated in the [Special District] Act should be interpreted as empowering a district to act, not as a limitation on a district's authority to act that might be found elsewhere in the statute.").

■ ¶ 9 Among the express powers granted to special districts are the powers "[t]o acquire, dispose of, and encumber real and personal property including, without limitation, rights and interests in property, leases, and easements necessary to the functions or the operation of the special district." § 32–1–1001(1)(f). The right to own property is necessary to these express powers. *Steamboat Lake Water & Sanitation Dist. v. Halvorson,* 252 P.3d 497, 502 (Colo.App. 2011) (a special district is "empowered to own a saleable, absolute fee interest in land"). Property ownership generally includes the power to exclude others, *see* Restatement (First) of Prop. § 7 (1936), and such power has "traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). We have located no law, and Keno provides none, suggesting that special districts, as landowners, are unable to acquire and exercise this common power.

■ ¶ 10 Further, the interpretation urged by Keno—that a special district can acquire and hold real property but is unable to regulate and, therefore, exercise its rights as a property owner and protect that property—is untenable. Were this true, a metropolitan district providing parks and recreation facilities would, for example, be unable to establish hours for visiting its offices and facilities or to prohibit hunting in a busy park. A fire district would be unable to exclude the public from entering a firehouse, sleeping in the beds, and using the kitchen. Such an interpretation would lead to absurd results, and therefore we cannot adopt it. *See Crandall,* 238 P.3d at 662.

¶ 11 A district's authority to regulate the use of its property (as opposed to property owned by others within the district's boundaries), and thereby exercise rights as a property owner, is implied by the powers to acquire, own, and dispose of that property. Therefore, Aspen Springs, as a special district, has authority to regulate use of the Greenbelt.

¶ 12 In addition to this general authority, the Special District Act specifically grants Aspen Springs the power to regulate the use of recreational and open space. Section 32–1–1004(3), C.R.S.2014, states that metropoli-

tan districts,[3] when providing parks or recreational facilities, have all the "duties, powers, and authority" granted to park and recreation districts by section 32–1–1005, C.R.S. 2014. That section authorizes park and recreation districts to "use the power granted in section 32–1–1001(1)(f) . . . for the preservation or conservation of sites, scenes, [and] open space . . . of recreational . . . or other public interest." § 32–1–1005(1)(b). The power to regulate and restrict access to real property is necessary to, and implied from, the express powers of preservation and conservation of real property. Therefore, Aspen Springs, like all other metropolitan districts providing parks or recreation facilities, may regulate the use of its real property in preserving or conserving open space.

¶ 13 Accordingly, the district court did not err in holding that Aspen Springs has the power to prohibit and limit grazing activities on the Greenbelt.

¶ 14 Our conclusion on this issue also disposes of Keno's argument that Aspen Springs lacked standing to seek a declaratory judgment with respect to matters outside its powers. Because Aspen Springs has the power to regulate property it owns, it has standing to seek declaratory and injunctive relief related to that legally protected interest. *See Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

### III. Colorado's Fence Law Does Not Permit Willful Trespass

¶ 15 Keno contends the district court erred in concluding that the Fence Law protects Aspen Springs from a willful trespass onto the Greenbelt, despite the fact the

Greenbelt is unenclosed by a lawful fence. We are not persuaded.

¶ 16 This contention presents another question of statutory interpretation that we review de novo. *See SDI, Inc.,* ¶ 15. We look to the plain meaning of the statutory language, and, if that language is clear, we apply it. *Specialty Rests. Corp. v. Nelson,* 231 P.3d 393, 397 (Colo.2010). Only if the statute is reasonably susceptible to multiple interpretations will we look to other aids in construction. *Id.*

¶ 17 Colorado's Fence Law, sections 35–46–101 to –114, C.R.S.2014, limits those situations in which a livestock owner may be held liable for trespass. The most significant limitation is found in subsection (1) of section 102, requiring that a plaintiff have maintained a "lawful fence" at the time of injury to recover certain damages from an owner of trespassing livestock. Subsection (2) then outlines two exceptions to the "lawful fence" bar to recovery provided in subsection (1). If a person (1) overstocks unenclosed land on which he has permission to release livestock, and those livestock trespass on the lands of another in search of water or food, or (2) stocks livestock upon land when he has no right to do so and the livestock grazes on that land,[4] the person "shall be deemed a trespasser and shall be liable in damages and subject to injunction." § 35–46–102(2). Finally, subsection (3) outlines remedies available for the trespasses described in subsection (2)[5]: recovery of actual damages and costs, exemplary damages if an injury has been caused by a "willful or reckless disregard of the injured person's rights," and injunctive relief against future trespasses. § 35–46–102(3).

---

3. Metropolitan districts are special districts that provide two or more services as specified in section 32–1–103(10), C.R.S.2014. Aspen Springs provides street improvement, water services, and parks and recreation services.

4. Keno argues that subsection (2) does not apply to him because he "stocks" his sheep on his property. In so arguing, he misinterprets "stock," as used in the statute, to mean "keep" or "house." The word "stock" first appeared in the Fence Law in 1953 as the result of an amendment that in large part formed the statute as it reads today. *See* Ch. 225, sec. 3, c. 160, § 58, 1953 Colo. Sess. Laws 587. As used in this

context, "to stock" means to "graze livestock on." *See Webster's Third New International Dictionary* 2247 (2002) (defining "stock" as, "to graze livestock on (as pasture)" and "to graze (livestock) on land and esp. grassland"). We note this definition has been little changed since at least 1940. *See Webster's New International Dictionary* 2480 (1958); *Webster's New International Dictionary* 2480 (1940).

5. We need not, and do not, decide whether subsection (3) proscribes remedies available for "such a trespass or injury" under subsection (1).

¶ 18 First enacted in the late 1800s, the Fence Law modified Colorado's common law by rejecting the strict liability faced by owners of trespassing livestock under the English common law. *See SaBell's, Inc. v. Flens*, 627 P.2d 750, 751 (Colo.1981); *Richards v. Sanderson*, 39 Colo. 270, 275, 89 P. 769, 770 (1907). But the Fence Law modified the common law of Colorado only "to the extent embraced in the statute, which may not be extended by construction, nor its application extended beyond its specific terms." *Robinson v. Kerr*, 144 Colo. 48, 52, 355 P.2d 117, 119–20 (1960). Therefore, the statute modifies actions in trespass by making the maintenance of a "lawful fence" a condition precedent to recovery of specified damages caused by trespassing livestock. § 35–46–102(1); *SaBell's, Inc.*, 627 P.2d at 751. The statute nonetheless left unchanged actions for willful trespass against livestock owners. *See SaBell's, Inc. v. Flens*, 42 Colo.App. 421, 423, 599 P.2d 950, 951 (1979), *aff'd*, 627 P.2d 750 (Colo.1981).

■ ¶ 19 Contrary to Keno's assertion, the Fence Law is not a license for livestock owners to graze their animals anywhere they please. Rather, the statute provides a defense to liability for damages caused by a non-willful trespass; it does not eliminate the underlying trespass or injury. *See* § 35–46–102(1) (providing that absent a lawful fence, "[n]o person shall recover damages for *such a trespass or injury*") (emphasis added); *see Robinson*, 144 Colo. at 52, 355 P.2d at 120 (recognizing that the Fence Law "at most provides a defense to an owner of trespassing livestock" for damages to grass, vegetables, and other crops).[6]

¶ 20 Courts have recognized a common law action for willful trespass by livestock since the earliest iterations of the Fence Law, and in so doing acknowledged that the statute neither changed the action nor provided a defense. *See SaBell's, Inc.*, 42 Colo.App. at 423, 599 P.2d at 951; *see also Bolten v. Gates*, 105 Colo. 571, 573–74, 100 P.2d 145,

146–47 (1940) (collecting cases); *Bell v. Gonzales*, 35 Colo. 138, 141, 83 P. 639, 640 (1905); *Sweetman v. Cooper & Mulvane*, 20 Colo. App. 5, 8, 76 P. 925, 926 (1904); *Norton v. Young*, 6 Colo.App. 187, 189–90, 40 P. 156, 157 (1895). Despite amendments to the statute after the earlier cases (but before the *SaBell's* decisions), we conclude that these cases remain persuasive and we decline to depart from their holdings.

¶ 21 The "ancient cases" Keno criticizes define the distinction between non-willful and willful conduct and, therefore, between those actions for livestock trespass that are, and are not, governed by the Fence Law.[7]

■ ¶ 22 A willful trespass occurs where a person conducts sheep or other livestock onto land despite knowledge that he has no right to pasture livestock on that land. *See Bell*, 35 Colo. at 141, 83 P. at 640; *Sweetman*, 20 Colo.App. at 8, 76 P. at 926. The supreme court has recognized that the Fence Law does not protect livestock owners who deliberately pasture their livestock on unenclosed lands of another, particularly when done against the owner's will. *See Bell*, 35 Colo. at 141, 83 P. at 640; *see also Sweetman*, 20 Colo.App. at 8, 76 P. at 926 (recognizing that a suit for willful trespass was proper when the plaintiff's protests against grazing were met with abusive epithets and continued trespass).

■ ¶ 23 In sum, Colorado's Fence Law modifies the common law of Colorado by adding a condition precedent to the recovery of damages in certain actions asserting non-willful trespass. This condition precedent, the lawful fence requirement, may be raised as a defense by livestock owners, but it does not apply in actions for willful trespass or in trespass actions brought under section 35–46–102(2) and (3).

¶ 24 Accordingly, the district court did not err in concluding that the Fence Law pro-

---

6. Nor does section 35–46–102(1), C.R.S.2014, contain any prohibition on injunctive relief.

7. In 1953, the Fence Law was amended to provide, among other things, for recovery in trespass against a person who overstocked land. *See* 1953 Colo. Sess. Laws at 587. Thereafter, actions in trespass arising from overstocking were governed by the provisions in the Fence Law, rather than the common law, and part of *Bolten*'s holding was superseded.

tects Aspen Springs from willful trespass onto its property.

## IV. The Second Contempt Finding Is Supported by Evidence and Law

¶ 25 Keno raises two contentions challenging the district court's second contempt finding. We reject both contentions.

■ ¶ 26 First, he argues that the evidence at the October 2013 contempt hearing was insufficient to support a finding of contempt. After the hearing, the district court found Keno in contempt for violating the preliminary injunction issued in March 2013. The preliminary injunction prohibited Keno from grazing or tethering his livestock on the Greenbelt. At the hearing, four witnesses testified that they had observed Keno's sheep grazing the Greenbelt and they presented photographic evidence of the trespassing sheep. The district court found that Keno's witnesses failed to directly contradict this evidence and that the testimony of one of Keno's witnesses was directly refuted by the photographic evidence. The court ultimately concluded that Keno's sheep had grazed the Greenbelt in violation of the preliminary injunction.

¶ 27 Because the record supports the district court's factual findings concerning contempt, we will not disturb those findings. *See In re Marriage of Webb*, 284 P.3d 107, 108–09 (Colo.App.2011) ("Factual determinations as to contempt must be accepted unless there is no support in the record or the findings are clearly erroneous." (internal quotation marks omitted)); *In re Marriage of Herrera*, 772 P.2d 676, 679 (Colo.App. 1989).

¶ 28 Second, Keno argues that the district court was required to apply the terms of the permanent injunction and declaratory judgment at the contempt hearing. This is incorrect. The October hearing was held to determine whether Keno had violated the preliminary injunction. At the time of the October hearing, the court had not yet issued either the permanent injunction or the declaratory judgment. Therefore, it was proper for the district court to determine whether Keno's actions violated the preliminary injunction.

## V. Attorney Fees for Contempt

■ ¶ 29 After finding Keno in contempt for a second time, the district court ordered him to serve seven days in jail, pay a $1000 fine, and pay Aspen Springs' costs and attorney fees. In its order, the court characterized the assessment of costs and attorney fees as a remedial sanction, and the fine and jail time as punitive sanctions. Keno asserts the court erred in awarding attorney fees and costs as a remedial sanction. We agree.

■ ¶ 30 We review the district court's interpretation of a rule of civil procedure de novo. *Garrigan v. Bowen*, 243 P.3d 231, 235 (Colo.2010).

¶ 31 C.R.C.P. 107 recognizes two types of sanctions for contempt of court. Remedial sanctions are "imposed to force compliance with a lawful order or to compel performance of an act within the person's power or present ability to perform." C.R.C.P. 107(a)(5). Punitive sanctions are "[p]unishment[s] by unconditional fine, fixed sentence of imprisonment, or both, for conduct that is found to be offensive to the authority and dignity of the court." C.R.C.P. 107(a)(4). C.R.C.P. 107(d)(2) permits the assessment of costs and attorney fees if remedial sanctions are imposed against a contemnor. In contrast, the provisions relating to punitive contempt sanctions do not authorize the assessment of costs and attorney fees. *See* C.R.C.P. 107(d)(1).

■ ¶ 32 A remedial sanction must include a purge clause. *Webb*, 284 P.3d at 110. When a court imposes a remedial contempt sanction, it must do so "in writing or on the record describing the means by which the person may purge the contempt." C.R.C.P. 107(d)(2). Unlike, for example, a contemnor's refusal to pay child support pursuant to a court order, an affirmative act carried out in the past that is not ongoing and results in a contempt citation cannot be purged. *See Webb*, 284 P.3d at 110 (one-time violation of court order could not be purged). This is because the contemnor cannot undo what was done. *See id.*

¶ 33 The district court attempted to impose both punitive and remedial sanctions against Keno. As punitive sanctions, the district court ordered him to pay $1000 and to serve seven days in jail. This unconditional fine and fixed sentence fall squarely within the rule's definition of punitive sanctions. Keno was not given the choice of paying the fine and serving seven days in jail, or complying with the court's order.

¶ 34 The court characterized the assessment of costs and attorney fees as a remedial sanction. But the sheep grazing activities that resulted in Keno's contempt citation were not ongoing at the time of the contempt hearing; they had occurred in the past. Thus, Keno could not purge his contempt because he could not undo what he had done. *See id.* (The mother's violation of a parenting order resulting in a contempt citation could not be purged because she "could not undo what she had done."). Therefore, remedial sanctions, such as the assessment of costs and attorney fees, could not be imposed against Keno under these circumstances. Instead, the court could impose only punitive sanctions.

¶ 35 The provisions of C.R.C.P. 107 relating to punitive contempt sanctions do not authorize the assessment of costs and attorney fees. *People v. Shell*, 148 P.3d 162, 178 (Colo.2006); *Webb*, 284 P.3d at 109; *Eichhorn v. Kelley*, 56 P.3d 124, 126 (Colo. App.2002) (noting that C.R.C.P. 107(d)(2) "specifically allows an award of attorney fees as a remedial sanction" but C.R.C.P. 107(d)(1) "has no comparable provision" for punitive sanctions). We therefore conclude that the district court erred in awarding costs and attorney fees.

## VI. Attorney Fees on Appeal

¶ 36 Keno requests an award of his attorney fees incurred on appeal. Under C.A.R. 39.5, appellate attorney fees may be awarded only if the requesting party states a legal basis for recovery. Because Keno failed to state a legal basis for recovery, we must deny his request. *See In re Marriage of Wells*, 252 P.3d 1212, 1216 (Colo.App.2011).

¶ 37 Aspen Springs also requests an award of appellate attorney fees. However, it recognizes that it is entitled to a fee award only if we uphold the district court's award of attorney fees and costs as a remedial contempt sanction. As we have reversed that portion of the district court's contempt order, Aspen Springs is not entitled to attorney fees for this appeal.

## VII. Scope of Injunctive Relief

¶ 38 Keno contends for the first time on appeal that the injunctive relief imposed is overly broad because it enjoins non-willful trespasses and covers property not owned by Aspen Springs.

¶ 39 C.A.R. 28(k) requires a party raising an issue on appeal to provide a citation to the precise location in the record where that party took action to preserve the issue for appellate review. Keno has provided no such citation, and we have found no indication in the record that his challenges to the breadth of either injunction were made to the district court. Accordingly, we do not address this issue.[8] *See Farmer v. Raemisch*, 2014 COA 3, ¶ 5, 320 P.3d 394.

## VIII. Conclusion

¶ 40 We vacate the portion of the district court's contempt order awarding Aspen Springs attorney fees and costs as a sanction. In all other respects the judgment and order are affirmed.

CHIEF JUDGE LOEB and JUDGE HAWTHORNE concur.

---

**8.** Keno contends that he had no notice of the breadth of the permanent injunction, and therefore could not have objected to it. However, our

review of the record indicates that the permanent injunction is consistent with the relief Aspen Springs requested in the district court.