The Supreme Court of the State of Colorado 
2 East 14th Avenue • Denver, Colorado 80203

2015 CO 63

Supreme Court Case No. 13SC497 
Certiorari to the Colorado Court of Appeals 
Court of Appeals Case No. 12CA1130

Petitioners:
Oasis Legal Finance Group, LLC; Oasis Legal Finance, LLC; Oasis Legal Finance
Operating Company, LLC; and Plaintiff Funding Holding, Inc., d/b/a LawCash;
v.
Respondents:
Cynthia H. Coffman, in her capacity as Attorney General of the State of Colorado; and
Julie Ann Meade, in her capacity as the Administrator, Uniform Consumer Credit Code.

Judgment Affirmed 
en banc
November 16, 2015

Attorneys for Petitioners:
Brownstein Hyatt Farber Schreck, LLP
Jason R. Dunn
Denver, Colorado
Attorneys for Respondents:
Cynthia H. Coffman, Attorney General
Frederick R. Yarger, Assistant Solicitor General
Denver, Colorado
Attorneys for Amici Curiae Chamber of Commerce of the United States of America and Denver Metro Chamber of Commerce:
McKenna Long & Aldridge LLP
David R. Fine
Denver, Colorado
Attorneys for Amici Curiae Colorado Civil Justice League, Colorado Defense Lawyers Association, and Property Casualty Insurers Association of America: 
Ruebel & Quillen, LLC
Jeffrey Clay Ruebel
Casey Ann Quillen
Westminster, Colorado
Attorneys for Amicus Curiae Colorado Trial Lawyers Association:
Ogborn Mihm, LLC
Anna N. Martinez
Thomas D. Neville
Denver, Colorado
Attorneys for Amici Curiae National Association of Consumer Advocates, Center for Responsible Lending, Consumer Federation of America, and National Consumer Law Center:
The Sturdevant Law Firm, APC
James C. Sturdevant
San Francisco, California
Wynkoop Law Office, PLLC
Rick Wynkoop
Wheat Ridge, Colorado
Amici Curiae, appearing pro se: Michael B. Abramowicz, Stephen Gillers, Myriam Gilles, Keith N. Hylton, Anthony J. Sebok, Victoria A. Shannon, Charles M. Silver, Spencer Weber Waller, and W. Bradley Wendel.
JUSTICE HOOD delivered the Opinion of the Court. JUSTICE GABRIEL does not participate.
 
¶1         Petitioners are national litigation finance companies. They buy interests in the potential proceeds of personal injury cases by executing agreements with tort plaintiffs to whom the companies provide money while the cases are pending (typically, less than $1,500). By the terms of the agreements, the money cannot be used to prosecute the legal claims. Instead, the plaintiffs are supposed to use the funds to pay personal expenses while waiting for their lawsuits to settle or go to trial.
¶2         In exchange, the plaintiffs agree to pay the companies a sum of money from the future litigation proceeds. This sum includes the amount advanced, an additional amount based on a “multiplier” that increases with the length of time it takes to resolve the claims, and various application and administrative fees. If the litigation proceeds are less than the amount due, the plaintiffs are not required to repay the shortfall.
¶3         This case concerns the nature of these litigation finance transactions. The companies contend they are asset purchases, but a state regulatory body classifies them as loans. The specific issue we address is whether these transactions are “loans” subject to Colorado’s Uniform Consumer Credit Code (the “UCCC” or the “Code”). §§ 5-1-101 to 5-13-103, C.R.S. (2015). We conclude they are.
¶4         We hold that litigation finance companies that agree to advance money to tort plaintiffs in exchange for future litigation proceeds are making “loans” subject to Colorado’s UCCC even if the plaintiffs do not have an obligation to repay any deficiency if the litigation proceeds are ultimately less than the amount due. These transactions create debt, or an obligation to repay, that grows with the passage of time. We agree with the court of appeals that these transactions are “loans” under the Code, and we therefore affirm its judgment.
I. Facts and Procedural History
¶5         Oasis Legal Finance Group, LLC; Oasis Legal Finance, LLC; Oasis Legal Finance Operating Company, LLC (collectively, “Oasis”); and Plaintiff Funding Holding, Inc., d/b/a LawCash (“LawCash”), operate nationwide, but they began doing business in Colorado in 2004 and 2001, respectively. They provide money to plaintiffs with pending personal injury claims arising from events such as automobile accidents, slip and falls, construction site injuries, and medical malpractice incidents. The language and structure of Oasis’s and LawCash’s litigation finance agreements differ, but the salient features are the same.
A. The Oasis Agreement
¶6         Oasis’s funding agreement is titled “Purchase Agreement.” The agreement
labels the tort plaintiff the “Seller” and the funding company the “Purchaser.” It describes the transaction as a sale and assignment—stating, for example, that the “Seller sells and assigns, and the Purchaser buys and assumes, the Purchased Interest.” The agreement defines “Purchased Interest” as “the right to receive a portion of the Proceeds equal to the Oasis Ownership Amount.” “Proceeds” are “whatever [the Seller] receive[s] as a result of the legal claim, for example through a judgment, Arbitration or the like.” “Oasis Ownership Amount” is “the amount Purchaser is to be paid out of the Proceeds” based on an attached payment schedule.[1] The tort plaintiff must authorize Oasis to obtain “a consumer credit report and/or other financial and credit information as part of the proposed transaction.”
¶7         The Oasis agreement begins with two prominent, capitalized provisions in the signature box. First, it states that “NO PART OF THE PURCHASE PRICE WILL BE USED TO SUPPORT, DIRECT OR MAINTAIN THE LEGAL CLAIM OR ITS PROSECUTION.” Second, it allows for the possibility that the Purchaser may recover nothing as a result of the transaction. It makes clear that “IF SELLER COMPLIES WITH THIS PURCHASE AGREEMENT AND RECOVERS NOTHING FROM THE LEGAL CLAIM CITED BELOW, THEN PURCHASER SHALL RECEIVE NOTHING,” while simultaneously emphasizing that “SELLER IS NOT ENTITLED TO RECEIVE ANY PROCEEDS UNTIL PURCHASER HAS RECEIVED THE OASIS OWNERSHIP AMOUNT.”
¶8         Oasis also acknowledges in the agreement that “Purchaser shall have no right to and will not make any decisions with respect to the conduct of the Legal Claim or any settlement or resolution thereof and that the right to make such decisions remains solely with Seller and Seller’s Attorney.” Consequently, the tort plaintiff retains control of the pending litigation.
¶9         In addition, the Oasis agreement requires Seller to treat the transaction as a sale—not a loan—for all purposes, including taxes. Likewise, it requires Seller to describe the Purchased Interest as an asset of Purchaser—not a debt obligation of Seller—in any bankruptcy proceedings.
B. The LawCash Agreement
¶10         LawCash’s agreement is titled “Funding Agreement,” though an earlier version bore the name “Lawsuit Investment Agreement.” The agreement characterizes the transaction as an assignment of an interest in the proceeds from the resolution of a pending case—but not, it makes plain, an assignment of the lawsuit or cause of action itself.[2] The amount assigned is equal to “the funded amount, together with accrued use fee, compounded monthly, and other fees or costs, from the proceeds of [the] [L]awsuit.” “Proceeds” include “any money paid as a consequence of the Lawsuit whether by settlement, judgment or otherwise.” The agreement alternately describes the transaction as a grant of a security interest and as a lien in those proceeds. A payment schedule lists payoff amounts, though the current sample agreement does not include any actual figures.[3]
¶11         The LawCash agreement echoes the Oasis agreement in several important respects. First, it restricts a tort plaintiff from using money advanced to finance the litigation proceedings. The money can be used for “life needs only.”
¶12         Second, the LawCash agreement acknowledges the possibility that LawCash might receive nothing depending on the outcome of the litigation. It states, for instance, that “there is no guarantee that the plaintiff will be successful or will recover sufficiently to satisfy [LawCash’s] lien in whole or in part” and that “LAWCASH will be paid only from the proceeds of the Lawsuit, and agrees not to seek money from me [the assignor] directly in the event that the Lawsuit is not successful.” Likewise, it provides:
If I [the assignor] do not recover any money from my lawsuit, I will not owe LAWCASH anything. If I recover money from my lawsuit, which is insufficient to pay the full amount due to LAWCASH, then LAWCASH’s recovery will be limited to the proceeds of the lawsuit.
¶13         Third, the LawCash agreement keeps control over the legal claim in the tort plaintiff’s hands. It states: “LAWCASH SHALL HAVE NO RIGHT TO AND WILL NOT MAKE ANY DECISIONS WITH RESPECT TO THE CONDUCT OF THE UNDERLYING CIVIL ACTION OR CLAIM OR ANY SETTLEMENT OR RESOLUTION THEREOF AND THAT THE RIGHT TO MAKE THOSE DECISIONS REMAINS SOLELY WITH ME AND MY ATTORNEY IN THE CIVIL ACTION OR CLAIM.”
¶14         Finally, the LawCash agreement characterizes the transaction as “an investment and not a loan.”
C. The Litigation
¶15         The litigation finance companies commenced this case after a state regulatory body concluded companies in their field were subject to UCCC regulation.
1. The Administrator’s Opinion Letter on
Pre-Settlement Lender Licensing
¶16         In April 2010, counsel for an unrelated business asked the office of the Administrator of the Colorado UCCC (the “Administrator”) for an opinion letter as to whether a business that engages in litigation finance needs any special licenses or is otherwise regulated in Colorado.[4] Counsel explained that the business would be “making non-recourse, pre-settlement loans” in Colorado:
Basically, my client makes an advance to individuals involved in pending litigation based upon its evaluation of the likely settlement amount of the case. If the case does settle, then the advance must be repaid with interest. If the case does not settle and results in a defense verdict or judgment, then the entire advance or loan is forgiven.
¶17         In response, the Administrator issued an opinion letter dated April 29, 2010, on “Pre-settlement Lender Licensing,” which concluded that these transactions are loans subject to the UCCC:
The Administrator concludes that a lender who engages in such transactions, variously called “litigation”, “lawsuit”, or “legal” “funding”, “financing”, or “advances”, with Colorado consumers must comply fully with Colorado’s Uniform Consumer Credit Code, §§ 5-1-101, et seq., C.R.S. 2009 (Code), including licensure.
¶18         The Administrator reasoned that the business “makes loans” under our decision in State ex rel. Salazar v. Cash Now Store, Inc., 31 P.3d 161 (Colo. 2001). The Cash Now Store entered into contracts to pay taxpayers an immediate sum of money in return for a partial assignment of taxpayers’ future federal or state tax refunds. Id. at 163–64. The refunds had been independently determined to be due but were generally not yet payable, and the advance was typically fifty to sixty percent less than the face value of the anticipated refund. Id. In the event that Cash Now received a refund that was less than anticipated, it could require the individual to pay the deficiency. Id. at 164.
¶19         Cash Now, facing an investigation that it was issuing usurious consumer loans, filed a complaint for a declaratory judgment as to whether the transactions violated the UCCC. Id. The trial court determined the transactions were purchases of choses in action, not consumer loans subject to the UCCC. The court of appeals agreed the transactions were not loans, labeling them sales and assignments instead. Id. We reversed and held that the transactions were UCCC loans. Id. at 163.
¶20         The Administrator’s opinion letter quoted our Cash Now decision in explaining that “a loan is made when a creditor creates debt by advancing money to the debtor.” Id.at 166.[5] The Administrator concluded the business she was asked to examine “advance[d] money to the consumer” and therefore made loans. She also noted that neither the UCCC nor Cash Now requires the borrower’s personal recourse for an advance to be a loan; nonrecourse loans, secured with the consumer’s lawsuit or its proceeds, fall within the UCCC’s scope.
¶21         The Administrator also concluded that the loans are “consumer loans,” as that term is used in the UCCC, see § 5-1-301(15), because (1) the recipients are individuals; (2) the debt is incurred “for personal, family, or household purposes”; (3) the advances are repaid with interest, constituting a finance charge; and (4) the advances are less than $75,000.
¶22         Oasis and LawCash assert that they stopped doing business in Colorado in 2010 after they became aware of the Administrator’s opinion letter. Before voluntarily suspending business operations in Colorado, they conducted business here without any formal consumer complaints.
2. The Administrator’s Investigation
¶23         In the course of formulating the opinion letter, the Administrator became aware of Oasis’s and LawCash’s litigation funding practices in Colorado and launched an investigation. 
¶24         On September 23, 2010, the Administrator advised Oasis and LawCash by letter of her determination that the companies made loans in violation of the UCCC and the Colorado Consumer Protection Act, §§ 6-1-101 to -1121, C.R.S. (2015). The Administrator offered to settle the matter through an ”Assurance of Discontinuance and Final Agency Order.” Oasis and LawCash declined.
3. The Declaratory Judgment Action
¶25         Oasis and LawCash filed this case against the Attorney General and the Administrator (collectively, “the State”), seeking a declaratory judgment that funding agreements of this type are not loans.
¶26         The State filed counterclaims seeking to enjoin Oasis and LawCash from making or collecting on such loans without being properly licensed. The State also sought penalties and sanctions under the statutes.
¶27         The State moved for partial summary judgment. The trial court held that the transactions in question create debt and are thus loans governed by the UCCC under (1) the Code’s plain language, (2) this court’s historical definition of “debt,” and (3) our ruling in Cash Now. It rejected the notion that the possibility of nonrecovery on some transactions necessarily removes them from regulation as loans. The trial court certified its ruling for immediate appeal under Colorado Rule of Civil Procedure 54(b).
¶28         The court of appeals affirmed. It emphasized that courts liberally construe the UCCC to promote consumer protection. Oasis Legal Fin. Grp. v. Suthers, 2012 COA 82, ¶ 10, __ P.3d __. It pointed out that in Cash Now this court rejected a “narrow interpretation” of the term “debt” in favor of a “broad reading” of the UCCC’s definition of “loan” and made clear that a loan does not require an unconditional obligation to repay. Id. at ¶ 11. And, citing the definition of “debt” from Black’s Law Dictionary (“a specific sum of money due by agreement or otherwise”), it stated that debt includes contingent debt, which may become fixed in the future with the occurrence of an event. Id. at ¶¶ 11–12. Because Oasis and LawCash create contingent debt, the court of appeals held the transactions at issue are loans. Id. at ¶¶ 12–13.
¶29         The companies appealed. We granted certiorari on the following issue: “Whether the court of appeals erred when it held that the litigation financing transactions in this case are subject to the requirements of the Uniform Consumer Credit Code (UCCC).”
II. Standard of Review
¶30         A trial court’s order granting or denying summary judgment is subject to de novo review. Westin Operator, LLC v. Groh, 2015 CO 25, ¶ 19, 347 P.3d 606, 611. Summary judgment is appropriate only if “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” C.R.C.P. 56(c). The material facts of this case are not in dispute.
III. Analysis
¶31         Oasis and LawCash have sought to structure their funding agreements as sales and assignments of assets, explicitly noting within the agreements that the transactions are not loans. The tort plaintiffs do not have an obligation to repay borrowed funds if the litigation proceeds recovered are less than the amount paid. The finance companies emphasize that they take on the risk of complete loss.
¶32         The State contends the transactions are loans—nonrecourse loans secured by litigation proceeds, loans hobbled with interest rates sometimes approaching triple digits. In arguing that these agreements fall squarely within the UCCC’s treatment of an advance of money as a loan, the State relies on this court’s statements in Cash Now that the UCCC does not require an unconditional obligation to repay for a transaction to be a loan.
¶33         We begin by providing background information on the UCCC and exploring its role in consumer protection. The Code commits us to a broad construction of its terms to effectuate its remedial purpose, but the statute’s general goals do not answer our specific question—that is, whether these transactions are “loans” under the UCCC. Therefore, we scrutinize the UCCC’s definition of “loan” and the guidance embedded within it that a “loan” creates “debt.” In doing so, we examine the substance of the transactions and apply our decision in Cash Now.
A. The Purposes and Policies of the UCCC
¶34         The UCCC regulates consumer credit transactions including consumer loans, leases, and credit sales. See § 5-1-301(12). For example, the Code seeks to corral what it terms “supervised loans,” consumer loans with an annual finance charge exceeding twelve percent. See § 5-1-301(47); § 5-2-201. The Code restricts authority to make supervised loans to “supervised lenders,” those licensed by the Administrator or otherwise exempted from the UCCC. See § 5-1-301(45), -301(46); § 5-2-301. The UCCC also regulates “payday” loans, see §§ 5-3.1-101 to -123; limits creditors’ collection remedies, see §§ 5-5-101 to -112; and restricts what parties can agree to, see §§ 5-3-101 to -305. In addition, the UCCC conforms consumer credit regulation to the policies of the federal Truth in Lending Act. § 5-1-102(2)(f); § 5-3-101; see 15 U.S.C. §§ 1601–1693r (2014). By requiring disclosure of the cost of credit, the UCCC strives to help consumers shop for the best deal. See Colorado Attorney General, Uniform Consumer Credit Code, http://www.coloradoattorneygeneral.gov/departments/consumer_protection/uccc_car/uccc (last visited Nov. 12, 2015).
¶35         Section 5-1-102(1) of the UCCC (“Purposes—rules of construction”) makes clear that “[t]his code shall be liberally construed and applied to promote its underlying purposes and policies.” § 5-1-102(1); see also Tulips Invs., LLC v. State ex rel. Suthers, 2015 CO 1, ¶ 14, 340 P.3d 1126, 1131; Cash Now, 31 P.3d at 166 (“Colorado’s UCCC is intended to be liberally construed to promote its underlying purposes and policies . . . .”).
¶36         The purposes and policies of the UCCC include protecting consumers from unfair practices, fostering competition among credit suppliers, and simplifying consumer credit law. See § 5-1-102(2)(a)–(g). See generally Dikeou v. Dikeou, 928 P.2d 1286, 1293 (Colo. 1996) (“[The UCCC] is designed to protect a typically unsophisticated borrower from a generally sophisticated lender.”).
¶37         The somewhat amorphous goal of consumer protection leaves room for a reasonable disagreement about whether and how litigation finance agreements should be regulated. Amici advance arguments why litigation finance is or is not ultimately good for consumers. But that is a question better suited to the legislature. The question for us is whether these transactions fit within the existing law’s definition of “loan.” The broad purposes of the UCCC do not on their own settle whether these transactions are “loans.” Our inquiry is only complete with a careful reading of the statute’s text and our precedent. To decide whether the litigation finance transactions before us qualify as UCCC loans, we turn to the statute’s definition.
B. “Loans” Under the UCCC
¶38         The UCCC defines “loan” to “include” “[t]he creation of debt by the lender’s payment of or agreement to pay money to the consumer . . . .” § 5-1-301(25)(a)(I). The definition of “loan” also encompasses the creation of debt through a credit account on which the consumer can draw, see § 5-1-301(25)(a)(II); the creation of debt by cash advance on a seller credit card or by a lender credit card issuer honoring the consumer’s drafts, see § 5-1-301(25)(a)(III), (V); or the forbearance of debt arising from a loan, see § 5-1-301(25)(a)(IV). Subsection (25)(b) excludes from the definition of “loan” the forbearance of debt arising from a sale or lease as well as a card issuer’s payments or agreements to pay third parties when consumers execute sales or leases with seller credit cards. See § 5-1-301(25)(b)(I)–(II). It is the first definition of loan that concerns us in this case, but we note that all of the definitions feature the crucial concept of debt.
¶39         The word “debt” also figures prominently in the Code’s definition of the more specific “consumer loan”:
a loan made by or arranged by a person regularly engaged in the business of making loans in which:
(I) The consumer is a person other than an organization;
(2) The debt is incurred primarily for a personal, family, or household purpose;
(3) Either the debt is by written agreement payable in installments or a finance charge is made; and
(4) Either the principal does not exceed seventy-five thousand dollars or the debt is secured by an interest in land.
§ 5-1-301(15)(a).
¶40         We agree with the Administrator that most of the elements of a consumer loan are readily satisfied in litigation financing transactions. Here, the tort plaintiffs are “persons”; the advances are for personal, family, or household purposes while litigation is pending; and the sums are well below the $75,000 figure as Oasis and LawCash advise “usually less than $1,500” is at issue.
¶41         While these definitions beg the question about the full regulatory reach of the Code, at the very least they make clear that debt is a necessary, if not completely sufficient, characteristic of the consumer transaction the Code seeks to regulate. So, we start there. Do the transactions at issue here create debt?
1.“Debt” Under the UCCC
¶42         We conclude that a litigation finance transaction of the type before us creates “debt” because it creates an obligation to repay. As we noted in Cash Now, the UCCC does not define the term “debt.” See Cash Now, 31 P.3d at 165 (“The statute defines the term ‘loan’ as including several methods by which debt is created and also the forbearance of debt arising from a loan. The statute does not further define the term ‘debt.’” (citation omitted)).
¶43         Though the term “debt” passes through the UCCC undefined, the Code signals within its definition of “loan” how debt can be created, which gives some indication of what debt is. A UCCC loan includes “[t]he creation of debt,” and, the definition continues, debt is created “by the lender’s payment of or agreement to pay money to the consumer.” § 5-1-301(25)(a)(I) (emphasis added).
¶44         Debt is a broad concept. The UCCC contemplates the creation of debt whenever a lender makes a payment of money to a consumer. Black’s Law Dictionary sets forth the meaning of many specific varieties of debt (nearly fifty types), but, as a general matter, it echoes the foregoing statutory language that “debt” is “a specific sum of money due by agreement or otherwise.” Black’s Law Dictionary 462 (9th ed. 2009). The Colorado Fair Debt Collection Practices Act defines “debt” as “any obligation or alleged obligation of a consumer to pay money arising out of a transaction, whether or not such obligation has been reduced to judgment.” § 12-14-103(6)(a), C.R.S. (2015). The federal Bankruptcy Code’s definition of debt is vast: “debt” is “liability on a claim,” 11 U.S.C. § 101(12) (2014), and a “claim” is a “right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured,” id. § 101(5)(A). The Colorado Uniform Fraudulent Transfer Act borrows this federal definition. See § 38-8-102(6), C.R.S. (2015).    Other state statutes similarly manifest capacious conceptions of debt. See Uniform Commercial Code—Secured Transactions, § 4-9-102(28), C.R.S. (2015) (defining “debtor” as a person with a non-lien interest in collateral regardless of whether he is an obligor); Colorado Foreclosure Protection Act, § 6-1-1103(3), C.R.S. (2015) (defining “evidence of debt” as a writing showing a right or promise to pay “a monetary obligation” including a note, bond, loan, credit, “or similar agreement”).
¶45         In sum, a debt is an obligation to repay. We conclude that the transactions here create debt because the plaintiffs receive a payment of money and, in exchange, they commit to fully compensate the finance companies from the future litigation proceeds. This does not establish these transactions are loans, however, because there are other forms of debt, resulting for example from sales, see, e.g., § 5-1-301(11)(a)(IV) (definition of “consumer credit sale” includes “debt”), that are not always subject to the Code’s regulation of loans. Debt is necessary but not sufficient. Therefore, we probe further and find that these transactions have other characteristics of loans and that they cannot plausibly be labeled sales or assignments.
2. Unconditional Obligation to Repay Not Required
¶46         The finance companies argue these transactions do not constitute loans or create debt because plaintiffs’ repayment obligations do not extend beyond their recoveries in the event of a shortfall. The finance companies point to the fact that, in approximately fifteen percent of cases, the litigation proceeds are less than the amount due, forcing the companies to adjust plaintiffs’ repayment obligations. And, they note, when claims yield nothing, plaintiffs pay nothing.
¶47         We do not find controlling significance in these intermittent losses. Litigation finance transactions create repayment obligations—debt—at the outset. That fact is unaffected by the finance companies’ subsequent reduction or cancellation of certain plaintiffs’ obligations. And in eighty-five percent of cases, the companies fully recover. Therefore, in evaluating these transactions, we focus on how they are designed to work and how they actually work most of the time.
¶48         Normally, Oasis and LawCash advance money and expect full repayment at a later date, and normally that is what happens. The finance company investigates a plaintiff’s claim; the parties sign an agreement; the plaintiff receives a payment of money; the litigation moves forward; and, after a settlement or successful trial, the plaintiff gives the finance company an amount of money equal to the amount advanced, plus an extra amount based on how long it took the plaintiff to pay up. Thus, the ordinary life of a litigation finance agreement is characterized by the creation and repayment of debt.
¶49         Cash Nowalso supports the view that these transactions constitute loans. We held there that exchanges of present money for future tax returns were loans under the Code, and in doing so we explicitly rejected the notion that a loan exists only where the borrower has an unconditional repayment obligation: “[W]e favor a broad reading of the UCCC’s definition of ‘loan’ over the court of appeals’ narrow interpretation, which requires an unconditional obligation to repay not mentioned in the statute.” Cash Now, 31 P.3d at 166. We then twice disclaimed the existence of any statutory repayment requirement for a transaction to be a loan. See id. at 165 (“[T]he definition of loan under the UCCC does not require repayment.”); id. at 166 n.2 (explaining the definition of “loan” in the UCCC “does not include the requirement of repayment”). These conspicuous similarities suggest Cash Now is a reliable beacon for us here.
¶50         Nonetheless, Petitioners assert that Cash Now is distinguishable because the taxpayers there were liable for any deficiency, whereas the tort plaintiffs here have no such obligation. The companies base this argument on the following passage from Cash Now:
As with the transactions at issue in [Income Tax Buyers, Inc. v. Hamm, No. 91-CP-40-3193, 1992 WL 12092431 (S.C. Ct. Com. Pl. Jan. 14, 1992)], the contracts at issue in the present case impose an obligation on the taxpayer to repay Cash Now only if the government fails to pay the amount of the anticipated tax refund. As the Hamm court explained, even the lender “demonstrates that it does not view the refund as a chose in action because the borrower owes it a sum of money whether the refund or ‘chose’ is valuable to [the lender] or not. This is debt.” Thus, the transaction is more properly characterized as a loan, rather than the sale of a chose in action.
Id.at 167 (second alteration in original) (citation omitted).
¶51         Petitioners are correct in part. Cash Now and the South Carolina case of Hamm (which also concerned purported sales of anticipated tax refunds) both involved deficiency clauses that left the taxpayer-borrowers on the hook if the expected tax returns failed to materialize, while here a tort plaintiff does not owe the litigation finance company a dime if his claim fails.
¶52         But this ultimately strikes us as a distinction without a difference. For one thing, the Hamm court was unpersuaded the transaction could escape treatment as a loan “even in the absence” of the deficiency clause. Hamm, 1992 WL 12092431, at *3. Further, the court of appeals correctly noted the above-quoted excerpt is “an acknowledgement of the facts in Cash Now, and not . . . a limitation on the court’s determination that a loan does not require an unconditional obligation to repay.” See  Oasis Legal Fin. Grp., ¶ 14.
¶53         In short, we did not restrict our holding in Cash Now to cases involving identical facts. The Cash Now transactions were recourse—meaning the debtor had an unconditional obligation to repay—but we did not hold that this characteristic was necessary under the UCCC. To do so would be to shoehorn the word “recourse” into the statute’s definition of loan: “[t]he creation of [recourse] debt by the lender’s payment of or agreement to pay money to the consumer . . . .” § 5-1-301(25)(a)(I). We are mindful that “in interpreting a statute, we must accept the General Assembly’s choice of language and not add or imply words that simply are not there.” People v.  Diaz, 2015 CO 28, ¶ 15, 347 P.3d 621, 625 (quoting People v. Benavidez, 222 P.3d 391, 393–94 (Colo. App. 2009)).[6]
¶54         In sum, the Code’s language and our Cash Now decision show that the repayment obligation need not be unconditional; the debt “created by” a UCCC loan need not be recourse. Litigation finance agreements create debt because they create repayment obligations. This is so notwithstanding the litigation finance companies’ embrace of risks that, from time to time, require them to adjust or cancel some plaintiffs’ obligations. Most of the time, plaintiffs repay the full amount borrowed—and more.
3. Obligation to Repay Grows with Time
¶55         We find it significant that the obligation increases with the passage of time, another characteristic of a loan. In fact, one of the features of a “consumer loan” under the UCCC is the presence of a “finance charge.”[7]See § 5-1-301(15)(a)(III). The Code defines “finance charge” as:
The sum of all charges payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or as a condition of the extension of credit, whether paid or payable by the consumer, the creditor, or any other person on behalf of the consumer to the creditor or to a third party, including any of the following types of charges that are applicable:
(I) Interest or any amount payable under a point, discount, or other system of charges, however denominated.
§ 5-1-301(20)(a)(I) (emphasis added); see also Black’s Law Dictionary 886 (defining “interest” as “[t]he compensation fixed by agreement or allowed by law for the use or detention of money . . . esp., the amount owed to a lender in return for the use of borrowed money”).
¶56         Here, the litigation finance companies require plaintiffs to repay more than the amount advanced. How much more is a function of time. See supra nn.1 & 3 (describing repayment schedules). The amount to which the companies are entitled does not fluctuate with market conditions; rather, it grows in predictable intervals fixed by the companies in the agreements. The longer the borrowed money is outstanding, the more the plaintiffs pay. Oasis denominates this rate of increase a “multiplier” while LawCash calls it a “monthly use fee,” but in both cases the charges function as interest. This growth in the repayment obligation over time is a finance charge and a hallmark of a consumer loan under the UCCC.
C. Litigation Fnance Transactions Are Not Sales or Assignments
¶57         Because the agreements do not transfer ownership rights, we reject the companies’ theory that these transactions are “sales” or “assignments.” In a sale, the parties agree to give and pass rights of property. See Wilson v. Frederick R. Ross Inv.  Co., 180 P.2d 226, 230 (Colo. 1947); accord § 4-2-106(1), C.R.S. (2015) (defining “sale” within the Uniform Commercial Code as “the passing of title from the seller to the buyer for a price”); see also Black’s Law Dictionary 1482 (defining “sell” as “[t]o transfer (property) by sale”). Similarly, an assignment transfers rights and duties and puts “the assignee in the assignor’s shoes.” SDI, Inc. v. Pivotal Parker Commercial, LLC, 2014 CO 80, ¶ 18 n.3, 339 P.3d 672, 676 n.3; accord Black’s Law Dictionary 136 (defining “assignment” as a “transfer of rights or property”).
¶58         As detailed above, the tort plaintiffs continue to control the pending litigation even though they are purportedly selling their rights to a portion of the proceeds from that litigation. Oasis and LawCash do not step into the tort plaintiffs’ shoes; the agreements provide them only with the rights that any creditor would have to receive payment of the amount due.[8]
IV. Conclusion
¶59         We hold that litigation finance companies that agree to advance money to tort plaintiffs in exchange for future litigation proceeds are making “loans” subject to Colorado’s UCCC even if the plaintiffs do not have an obligation to repay any deficiency if the litigation proceeds are ultimately less than the amount due. These transactions create a debt, or an obligation to repay, that grows with the passage of time. We agree with the court of appeals that these transactions are “loans” under the Code, and we therefore affirm its judgment.
 JUSTICE GABRIEL does not participate.

[1] Oasis’s sample agreement uses $1,234.00 as the purchase price. Per the payment schedule, if the Seller pays off that amount to Oasis within six months, the payoff amount is $1,851.00 ($617.00 above the purchase price). That amount continues to increase based on a multiplier. For instance, within one year to fifteen months, the payoff amount is $2,776.50 ($1,542.50 above the purchase price). Within two years to thirty months, the payoff amount is $4,010.50 ($2,776.50 above the purchase price).
[2] In our state, “[w]hether a cause of action for personal injury is now assignable . . . and, even if not, whether the recovery from a personal injury claim is assignable before it is reduced to settlement or judgment” remains an open question. See Allstate Ins. Co. v.  Medical Lien Mgmt., 2015 CO 32, ¶ 21, 348 P.3d 943, 950. In Allstate, we noted that “an extremely small minority of jurisdictions” allow for the full assignability of a cause of action for personal injury, but “a not insignificant number of jurisdictions” recognize the assignability of proceeds from a personal injury action. Id. at ¶ 18, 348 P.3d at 949. But we did not enter the debate because the complaint in Allstate did not allege the breach of such an assignment, and the assignee did not pursue the assignor’s personal injury claim as the real party in interest. See id. at ¶ 17, 348 P.3d at 948–49. Thus, the validity of either type of assignment was not before us. We need not answer the question here either because the State does not argue that the litigation financing agreements are void or unenforceable because the proceeds from a personal injury action cannot be assigned. Rather, it argues that the agreements create loans subject to the UCCC. We agree with the State that the transactions at issue are loans and not assignments. Consequently, we do not evaluate whether a tort plaintiff can assign the potential proceeds from a personal injury action.
[3] An older sample agreement, which contains notations and appears to be a draft, uses $2,000 as the purchase price. Per the payment schedule, if the tort plaintiff pays off that amount to LawCash within about two months, the payoff amount is $2,779.32 ($779.32 above the purchase price). That amount continues to increase based on a multiplier. For instance, a year later, the payoff amount is $3,923.92 ($1,923.92 above the purchase price). The maximum that LawCash can receive is listed as $6,724.24 ($4,724.24 over the purchase price). The agreement lists the annual percentage rate of return on investment (“APR”) as forty-two percent.
[4] The Administrator is charged with the administration and enforcement of the UCCC and is authorized to provide guidance on how to comply with the Code. See, e.g., § 5-6-104(1)(b) (providing the Administrator with authority to “[c]ounsel persons and groups on their rights and duties under this code”).
[5] In this part of Cash Now, we were discussing an official comment to the UCCC. See § 5-3-106, cmt., 2 C.R.S. (1999). That comment did not survive the Code’s reorganization in 2000, but its disappearance does not affect our analysis because the Code’s definition of “loan” remains the same except that the current statute substitutes “consumer” for “debtor.” Compare § 5-1-301(25)(a)(I), C.R.S. (2015), with § 5-3-106(1), 2 C.R.S. (1999).
[6] We also note that other UCCC jurisdictions have arrived at the same conclusion. For example, the South Carolina Administrator of the Department of Consumer Affairs determined in a November 14, 2014, opinion letter:
[A] litigation funding transaction meets the definition of a loan as monies are given to the consumer. The broad concept of a “loan” under the UCCC certainly encompasses those circumstances where the consumer does not have an unconditional obligation to repay.
Notably, the South Carolina Code defines “loan” and “consumer loan” in substantially the same manner as the Colorado Code. Compare S.C. Code Ann. § 37-3-106(1) (2015) (defining “loan”), and § 37-3-104 (defining “consumer loan”), with § 5-1-301(25)(a)(I), C.R.S. (2015) (defining “loan”), and § 5-1-301(15)(a) (defining “consumer loan”). Similarly, the Kansas State Bank Commissioner reached the same conclusion in an opinion letter dated July 7, 2009, which observed the Kansas UCCC did not require an absolute repayment obligation and concluded that “plaintiff agreements” constitute loans under the Kansas UCCC.
In slightly different regulatory settings, the particular finance companies in this case have been treated as lenders. Maryland’s Attorney General opined in November 2009 that a legal funding agreement constitutes a loan under the Maryland Consumer Loan Law, see Md. Code Ann., Com. Law, § 12-301(e) (2009), in a case involving Oasis. And in Echeverria v. Estate of Lindner, No. 018666/2002, 2005 WL 1083704, at *8 (N.Y. Sup. Ct. Mar. 2, 2005), a New York court concluded that LawCash’s litigation financing contract was a loan “at usurious rates,” “not an investment with great risk.”
[7] A finance charge is also characteristic of a “consumer credit sale,” see § 5-1-301(11)(a)(IV), but consumer credit sales, unlike consumer loans, involve an exchange of “goods, services, a mobile home, or an interest in land,” § 5-1-301(11)(a). Litigation finance agreements do not feature such exchanges; the companies swap money now for plaintiffs’ obligations to pay more money later. We discuss, and reject, the companies’ sale or assignment theory below. 
[8] Indeed, in an unrelated bankruptcy action, LawCash filed a proof of claim as a creditor seeking a security interest in arbitration funds where it had advanced money to a tort plaintiff through “an assignment of his interest in the proceeds of the Lawsuit.” See In re Sas, 488 B.R. 178, 181 & nn.11 & 13 (Bankr. D. Nev. 2013). Likewise, Oasis filed a proof of claim as a creditor in a tort plaintiff’s bankruptcy action after that debtor failed to repay litigation funding advances. See In re Armstrong, No. 14-18107, 2014 WL 5816950, at *1–3 (Bankr. N.D. Ill. Nov. 7, 2014).