23CA0605 Marriage of Goldstone 10-17-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0605
Boulder County District Court No. 21DR30037
Honorable Bruce Langer, Judge

---

In re the Marriage of

Nicole K. Collins,

Appellee,

and

Scott J. Goldstone,

Appellant.

---

APPEAL DISMISSED IN PART, JUDGMENT AFFIRMED,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE RICHMAN*
Dunn and Navarro, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

---

Scardina Law, LLC, Autumn Scardina, Todd Scardina, Denver Colorado, for
Appellee

Aitken Law, LLC, Sharlene J. Aitken, Denver, Colorado, for Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    Scott J. Goldstone (husband) appeals the district court's judgment of punitive contempt. We dismiss the appeal in part, affirm the judgment against husband, and remand the case for further proceedings regarding appellate attorney fees.

I.    Relevant Facts and Procedural History

¶ 2    On November 16, 2021, the district court entered written permanent orders dissolving the marriage between husband and Nicole K. Collins (wife). As relevant here, the court allocated husband's Chase checking account x7523 (Chase account) to wife. The account had a $2,923 balance at the time of the permanent orders hearing in October 2021. Because a month had passed since the hearing, the court ordered the parties to evenly split any fluctuation of 10% or greater to the value of the Chase account. The court also ordered the parties to sell their home (Jackson home) and split the proceeds equally. And the court divided husband's retirement account (TD Ameritrade account) by allocating $158,375 from the account to wife and the remaining $162,236 to husband. Again, because the court's value for the TD Ameritrade account was based on its value at the time of the hearing a month earlier, the court ordered the parties to divide any increase in the account as of

1

November 16, 2021, by allocating wife 45% and husband the other 55%.

¶ 3        The parties filed motions for post-trial relief.  In response to husband's requests, the court directed the parties to determine any fluctuation in the Chase account's value as of November 16, 2021, and to evenly divide the property taxes owed on the Jackson home should it not sell in 2021 (post-trial order).  The court also declined husband's request to amend the allocation of the TD Ameritrade account.

¶ 4        Following the post-trial order, wife alleged that husband had not transferred to her the Chase account or her share of the TD Ameritrade account.  She asked the court to enter judgments against husband and award her interest.  During the pendency of that motion, wife informed the court that husband had transferred to her the Chase account, but she asserted that husband had taken money from the account, had misrepresented to her the true value of the account, and continued to withhold the full value allocated by the court.

¶ 5        The court entered a judgment against husband and awarded wife interest (money judgment order).  Husband then paid wife the

2

remaining funds from the Chase account and attempted to settle the TD Ameritrade account by sending wife checks for her share.

¶ 6 Husband appealed. During the pendency of the appeal, wife pursued punitive contempt sanctions against husband, alleging that he willfully violated the court's orders concerning (1) the Chase account; (2) the Jackson home; and (3) the TD Ameritrade account. Husband asked the court to stay the contempt proceedings due to the pending appeal. The court denied his request, and after a three-day hearing, it found husband guilty of punitive contempt. Husband asked the court for another stay, and after denying that request, the court ordered him to serve ten days on work crew through the county jail.

¶ 7 A division of this court later affirmed the permanent orders, including the allocation of the TD Ameritrade account, but reversed the date of "wrongful withholding" for purposes of calculating the award of interest provided by the money judgment order. *In re Marriage of Collins*, 2023 COA 116M, ¶¶ 27, 76, 88 (*Collins I*).

## II. Husband's Right to Testify

¶ 8 Husband contends that the district court made comments during the contempt hearing that "foreclosed [his] constitutional

right to testify by prohibiting [him] from deciding at what point, and if, he was going to testify." We disagree.

## A. Legal Principles

¶ 9 In a punitive contempt proceeding, an alleged contemnor has the right to remain silent as well as the right to testify in their defense. C.R.C.P. 107(d)(1); *see Moore v. People*, 2014 CO 8, ¶ 10; *People v. Razatos*, 699 P.2d 970, 977 (Colo. 1985). The contemnor's decision on whether to testify is within their exclusive discretion, and they may surrender this right through a knowing, voluntary, and intelligent waiver. *See Moore*, ¶ 10. We review de novo whether a court infringed on a party's right to testify. *See id.* at ¶ 17.

## B. Discussion

¶ 10 As an initial matter, wife argues that husband cannot assert this argument in his direct appeal of the contempt judgment but that he, instead, must raise it "through [a] post-conviction proceeding." She highlights that in criminal proceedings, a defendant must challenge their waiver of the right to testify through postconviction relief. *See id.* at ¶¶ 8, 17. However, the postconviction relief proceedings available to criminal defendants do not extend to a judgment of punitive contempt. *See Benninghoven*

4

*v. Dees*, 849 P.2d 906, 908 (Colo. App. 1993). Still, wife suggests that husband could have raised this issue under C.R.C.P. 107(e), which allows a court to reconsider punitive sanctions. But C.R.C.P. 107(e) does not set forth a process by which a contemnor may seek postconviction relief. And even if we were to assume that husband could have sought such relief under C.R.C.P. 107(e), wife directs us to no legal authority that required him to do so or that now precludes us from addressing his argument that the court's comments foreclosed his right to testify. Absent such authority, we elect to review husband's contention and discern no error.

¶ 11     After continuing the contempt hearing to a third day, the court commented to wife's attorney that the hearing must be completed at their next setting. Wife agreed to conclude her case but noted that she was not accounting for any testimony husband may offer in his defense. The court said that they would "cross that bridge if we come to it" and then said, "Imagine how thrilled I'm going to be if I find out that we have another few hours that I wasn't given advance notice of."

¶ 12     Near the end of the hearing's third day, and after the completion of wife's case-in-chief, the court asked husband's

attorney if she would be presenting "any witnesses." When husband's attorney asked to have a few minutes to discuss the matter, the court responded, "This hearing is over in 15 minutes. . . . This is something that should have been addressed long ago. . . . I understand you have a right to wait and decide what you're going to do, but . . . I am not setting a fourth hearing."

¶ 13 After a recess, husband's attorney told the court that husband would assert his constitutional right to remain silent and that she would not present any other additional witnesses in husband's defense. (Earlier in the hearing, one witness testified for husband's defense.) In response, the court clarified its "intemperate words," saying that husband "absolutely ha[d] a right to testify" and it didn't want him to take what the court had said as "trying to prevent him from testifying if he wishe[d] to do so." The court further said that "if [husband] wishe[d] to testify, [it] [would] find a way to make that happen" and that it wanted to "make sure that that's clear." Following the court's additional clarification, husband's attorney confirmed that husband would not testify.

¶ 14 Husband, who is a practicing attorney, does not dispute that the court properly advised him of his right to remain silent before

the hearing and that he confirmed his understanding of that right. Although the court expressed some frustration concerning the length of the hearing, the court clarified to husband that those comments should not impede him from freely exercising his right to testify. In addition to that clarification, husband conferred with his trial and appellate attorneys, both of whom were present throughout the contempt hearing, immediately before deciding not to testify. And he makes no claim that they did not fully inform him of his rights. Moreover, contrary to husband's suggestion, he was not required to decide whether to testify until after wife had completed her presentation of evidence. *See People v. Reed*, 216 P.3d 55, 58 (Colo. App. 2008) ("The decision to testify at trial remains within the exclusive discretion of a defendant; . . . a defendant has the constitutional right to decide at what point . . . he or she wishes to testify.").

¶ 15     We therefore discern no merit to husband's assertion that the court prohibited him from deciding when, and if, he would testify. The decision not to testify was made by husband, and the record reveals that he voluntarily, knowingly, and intelligently declined to do so after being fully informed of his rights.

7

### III. Punitive Contempt Determinations

¶ 16    We next consider and reject husband's contentions challenging the district court's entry of punitive contempt.

### A. Legal Principles

¶ 17    A court may hold a party in contempt for disobedience or resistance to, or interference with, a lawful court order. C.R.C.P. 107(a)(1). When the court finds that the contemnor's conduct was offensive to the authority and dignity of the court, it may impose punitive sanctions. *See* C.R.C.P. 107(a)(4), (d)(1); *In re Parental Responsibilities Concerning A.C.B.*, 2022 COA 3, ¶¶ 18, 23. Punitive sanctions must be supported by proof beyond a reasonable doubt that (1) a lawful court order existed; (2) the contemnor knew of the order; (3) the contemnor had the ability to comply with the order; and (4) the contemnor willfully refused to comply. *A.C.B.*, ¶ 23.

¶ 18    Whether a party is in contempt lies within the court's sound discretion, and its factual findings are binding on review unless they are clearly erroneous. *In re Marriage of Webb*, 284 P.3d 107, 108-09 (Colo. App. 2011). We therefore will uphold the court's contempt decision absent a showing that it acted in a manifestly

arbitrary, unreasonable, or unfair manner, or misapplied the law. *In re Marriage of Sheehan*, 2022 COA 29, ¶ 23.

### B. Chase Account

¶ 19    Husband contends that the record does not support the district court's finding that he knowingly and willfully withdrew money from the Chase account in violation of the court's orders. We disagree.

¶ 20    The court found that the November 16, 2021, written permanent orders allocated the Chase account to wife. The court noted that husband took a screenshot of the account's balance at 1:31 a.m. on November 17, 2021, apparently to represent the account's November 16, 2021, balance. The court found that on November 17, 2021, and before husband took the screenshot, he used $3,149 from the account to pay his credit card bill (a debt the court allocated to him). The court further found that although husband "testified" that he had not reviewed the permanent orders before the credit card payment, the weight of the evidence indicated otherwise.

¶ 21    The court also noted that husband had made other withdrawals from the Chase account and that he had

misrepresented the balance of the account during the parties' post-decree efforts to "reconcile" the court's allocation. Additionally, the court determined that husband's delay in transferring the account balance to wife was unreasonable and that it could not find any good faith explanation for his "foot-dragging other than that he was unhappy with the [c]ourt's orders and attempted to pressure [wife] into agreeing to a resolution more favorable to him."

¶ 22    The court then concluded that a lawful order existed for the allocation of the Chase account to wife, husband knew of that order, he had the ability to comply with it, and he willfully failed to comply.

¶ 23    Contrary to husband's contention, the record and reasonable inferences drawn from it support the court's findings that husband knew of the permanent orders before he paid his credit card debt and that his use of the Chase account was a willful violation of the permanent orders. *See In re Marriage of Thorburn*, 2022 COA 80, ¶ 49 (recognizing that credibility determinations and the weight, probative force, and sufficiency of the evidence, as well as the inferences and conclusions to be drawn, are matters within the district court's sole discretion); *Aspen Springs Metro. Dist. v. Keno*,

2015 COA 97, ¶ 27 ("Because the record supports the district court's factual findings concerning contempt, we will not disturb those findings.").

¶ 24     Husband's former attorney testified that he received the permanent orders on November 16, 2021, and that his typical practice was to inform his client of a court's permanent orders. His attorney also confirmed that husband created a screenshot of the TD Ameritrade account's balance on November 16, 2021, but did not create a screenshot of the Chase account's balance until November 17, 2021 (after the credit card payment had been made). Additionally, wife testified that during the few months of discussions after permanent orders, husband never disclosed that he had paid his credit card with the Chase account funds and continuously misrepresented to her the actual balance of the account as of November 16, 2021. She also testified that in their discussions, husband tried to convince her to let him keep the Chase account and that, when she took action to have the account transferred, husband initially did not cooperate. Wife further testified that, in addition to the credit card payment, husband

11

withdrew an additional $3,000 from the Chase account and that when she ultimately received the Chase account, it had only $459.

¶ 25     Husband asks us to draw different inferences from the conflicting evidence, but we may not set aside the court's determinations, when, as here, the record supports them.  *See Thorburn*, ¶ 49; *Aspen Springs*, ¶ 27.

¶ 26     Husband also disputes the court's reference to his "testimony" in its ruling, noting that he never testified at the hearing.  Even if the court mistakenly mentioned that husband testified, the court's comment referred to husband's claim that he did not know of the permanent orders when his credit card debt was paid, and husband does not dispute that he asserted this claim in his defense.  Indeed, husband submitted an affidavit to the court, which was admitted at the hearing, in which he attested that he initiated the credit card payment before he had reviewed the court's permanent orders. Husband does not challenge the admission of the affidavit, and we therefore discern no prejudice from the court's misstatement that husband "testified."  *See* C.A.R. 35(c).

¶ 27     Nor are we persuaded that the absence of a specific deadline in the permanent orders directing when husband must transfer the

account renders the court's contempt decision improper. As discussed below, the court acted within its discretion to apply a reasonable time analysis in the absence of a specific deadline. And the court found, with record support, that husband unreasonably delayed the transfer of this account for three months to try to receive a more favorable allocation. *See Thorburn*, ¶ 49; *Aspen Springs*, ¶ 27.

¶ 28 The court therefore did not abuse its discretion by finding husband guilty of punitive contempt for withdrawing money from the Chase account after knowing that the account had been allocated to wife and misleading her about the account's balance.

## C. Jackson Home

¶ 29 Husband also contends that the district court erred by imposing the punitive contempt judgment related to the Jackson home. He argues that, in wife's contempt motion, she alleged that he violated only the permanent orders, while the court relied on provisions of the post-trial order to conclude that he violated his obligation to pay an equal share of the 2021 property taxes. We disagree.

¶ 30 The permanent orders directed the parties to sell the Jackson home and split the proceeds equally. The court found that the home sold a few months after the entry of permanent orders and a month after the post-trial order, which clarified that the parties must equally divide any property taxes due on the Jackson home. It found that husband refused to pay his share of the 2021 property taxes when the home sold and that his actions required $3,049 from wife's share of the sale proceeds (half the amount of the outstanding property taxes) being placed in escrow. The court noted that husband purportedly justified his refusal to pay the 2021 property taxes because wife received a financial windfall by being allowed to live in the home rent free for several months more than him. And it found that the escrowed funds were not released to wife until husband made the request approximately two months after the closing of the sale.

¶ 31 The court determined that husband had no basis for insisting that wife's funds be held in escrow for the property taxes. And it concluded that husband willfully violated the permanent orders by delaying wife's receipt of her share of the sale proceeds.

¶ 32     A contemnor must have notice of the order they are alleged to have violated. *See In re Marriage of Nussbeck*, 974 P.2d 493, 499 (Colo. 1999). And to be held in contempt, the contemnor must have refused to do exactly what the court's order required. *See In re Marriage of Davis*, 252 P.3d 530, 537 (Colo. App. 2011).

¶ 33     According to husband, he did not violate the court's permanent orders because that order did not address his obligation to equally divide the property taxes owed on the Jackson home. However, as the district court noted, the permanent orders directed husband and wife to "equally split the proceeds" from the sale of the Jackson home. And the record revealed that, when they closed on the home's sale, they had to pay their property tax obligation from the sale proceeds. Thus, by refusing to pay his share of the property tax obligation at the closing, husband caused wife to receive less than her equal share of the sale proceeds at the closing, which was a violation of the permanent orders. We therefore reject husband's claim that the court relied on the post-trial order to find him in contempt.

¶ 34     Nor are we persuaded by husband's suggestion that the court could not consider the post-trial order when reaching its conclusion

that he violated the permanent orders. To the extent husband claimed any confusion concerning his obligations imposed by the permanent orders, the post-trial order clarified that the parties must evenly divide the property taxes owed on the home. But a month after this order, husband still refused to do so, and his conduct was relevant evidence for the court to consider when determining that he willfully refused to comply with his obligation under the permanent orders.

¶ 35 Husband goes on to highlight evidence from the hearing which he believes could have supported findings contrary to those made by the district court. Although conflicting evidence was presented, we must defer to the court's resolution of those conflicts, when as here the record supports the court's findings. *See Thorburn*, ¶ 49; *Aspen Springs*, ¶ 27. In particular, the parties' real estate agent testified that husband did not agree to pay the property taxes at closing; his insistence caused the disputed funds, which were due to wife, to be placed in escrow; and those funds were not released to wife until husband agreed to do so. Wife also testified that husband's actions deprived her of her equal share of the home sale

proceeds at closing and unjustifiably delayed her receipt of the funds allocated to her.

¶ 36    The court therefore acted within its discretion to find husband guilty of punitive contempt for not complying with its order on the allocation of the Jackson home.

### D.    TD Ameritrade Account

¶ 37    Husband next contends that the district court erred by entering the punitive contempt judgment against him concerning the TD Ameritrade account.  He argues that the permanent orders did not specify the manner by which he had to transfer the TD Ameritrade account to wife and that the court improperly relied on its later orders to conclude that he was obligated to transfer her share of the account directly to her.  We disagree.

¶ 38    In its contempt order, the court determined that, based on the value of the TD Ameritrade account as of November 16, 2021, the permanent orders allocated to wife $178,137 and that the "clear intent" of the court's allocation "was that the funds should be in the form of a transfer from the TD [Ameritrade] account" to wife, and not a cash payment.

¶ 39    The court further explained that, following the permanent orders, husband tried to get the court to revisit its allocation and have wife share in the post-decree losses sustained in the TD Ameritrade account.  And it noted that after the court denied his multiple requests, he tried to supplant the court-ordered division of the account with a cash payout to wife, allowing him to retain the TD Ameritrade account holdings.  Specifically, the court found that instead of transferring her share of the account, husband sent wife checks totaling $178,137 and that by doing so, husband willfully violated the court's order.

¶ 40    Contrary to husband's claim, the permanent orders were not "silent" on the way by which he was directed to satisfy the allocation of the TD Ameritrade account.  The permanent orders expressly allocated to wife a specific value of the funds "[f]rom [the] account."  *See Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000) (recognizing that we construe language in accordance with its plain and generally accepted meaning).  Moreover, husband attested that he contacted a representative at TD Ameritrade within two days of the entry of permanent orders to learn how he could transfer the funds from the account to wife,

demonstrating his belief that he needed to effectuate a direct transfer to wife from the account.

¶ 41 We also reject husband's argument that the court modified the permanent orders when it directed him to "pay" wife "the $178,137" in the money judgment order.  (Although *Collins I* did not directly resolve this issue, it "question[ed]" husband's claim that the money judgment order modified any aspect of the court's permanent orders.  *Collins I*, ¶ 78.)  Even though the court used the term "pay," it made clear that it was not "reconsider[ing] its findings and orders in [p]ermanent [o]rders."

¶ 42 Husband notes that in the money judgment order, the court directed him to pay the funds from the TD Ameritrade account within seven days and argues that because a transfer from the account would be impractical within that time frame, it is reasonable to interpret the court's statement as modifying the permanent orders.  However, he directs us to nothing in the record that established he could not initiate or complete a transfer from the TD Ameritrade account within this timeframe or that the court understood that such a limitation existed.

¶ 43 Husband goes on to claim that the court erroneously considered "multiple court orders" to determine that he was required to directly transfer her share of the TD Ameritrade account to wife. True, the court considered the money judgment order in addition to the permanent orders. But it was husband who injected the money judgment order into the court's consideration by alleging that this order had modified the allocation set forth by the permanent orders. Thus, to fully address husband's defense, the court logically considered the provisions of the money judgment order and determine the effect that order had on the court's allocation. And the court only mentioned the post-trial order when noting that husband had unsuccessfully tried to modify the allocation of the TD Ameritrade account.

¶ 44 Nor do we agree that by discussing the multiple orders, the court's findings lacked specificity. The court plainly relied on its allocation of the TD Ameritrade account in the permanent orders, and it found that husband knew of his obligation under that order, had the ability to comply with it, and willfully refused to comply.

¶ 45 In his reply brief, husband also notes that *Collins I,* as relevant here, reversed the court's determination for the date from which

husband wrongfully withheld the TD Ameritrade account. *Id.* at ¶ 76. He argues that given that determination in *Collins I* and the district court's reliance on the money judgment order in support of its contempt ruling, the contempt judgment must be reversed. However, *Collins I* affirmed the permanent orders allocation of the TD Ameritrade account. *Id.* at ¶¶ 24-27. And the court's contempt ruling was based on husband's failure to comply with that order; it was not based on the money judgment order.

¶ 46 Additionally, *Collins I* concluded that the district court did not properly calculate the date for determining when wife reasonably expected to receive the TD Ameritrade account funds when awarding interest. *Id.* at ¶¶ 72-75. It did not, as husband suggests, conclude that he had not wrongfully withheld the funds from the TD Ameritrade account. Moreover, when the court entered its contempt ruling (over a year after the entry of permanent orders), it found that husband still had not transferred the funds from the TD Ameritrade account as directed, and it found that his continued, unreasonable delay supported the willfulness of his violation. *Collins I* would not affect that determination.

21

¶ 47    The district court therefore did not err by finding that husband willfully violated the court's order concerning the allocation of the TD Ameritrade account.

## E.    Reasonable Time to Comply

¶ 48    When addressing the allegations of punitive contempt, the district court considered husband's defense that the permanent orders did not contain clear deadlines by which he must comply, and it found that when no stated deadline exists, it was appropriate to apply a reasonable time analysis. Husband argues that the court's decision was unsupported by any legal authority. However, as noted in *Collins I*, when a time for performance is not specified, the court may imply a reasonable time for performance. *Id.* at ¶ 73; *see In re Marriage of Cyr*, 186 P.3d 88, 95 (Colo. App. 2008).

¶ 49    We therefore reject husband's claim that the court acted without legal authority to apply a reasonable time analysis. And as discussed above, the court found, with record support, that husband failed to comply with the court's orders within a reasonable time.

### F.  Offensive to the Authority and Dignity of the Court

¶ 50    At the start of the sentencing hearing, the district court supplemented its contempt findings and found "beyond a reasonable doubt that [husband's] conduct was offensive to the authority and dignity of the [c]ourt." *See* C.R.C.P. 107(a)(4), (d)(1). Husband contends that the court's finding, entered almost two months after the contempt ruling, was improper.

¶ 51    However, a court may revise or amend any of its findings before entering a final judgment. *Collins I*, ¶ 79. And a judgment of contempt is not final until the court imposes a sanction. *In re Marriage of January*, 2019 COA 87, ¶ 12. Thus, although the court did not expressly find that husband's conduct was offensive to the authority and dignity of the court when it initially entered its contempt ruling, the court acted within its authority to supplement its ruling and make that finding before it imposed punitive sanctions. *See Collins I*, ¶ 79. And husband directs us to no legal authority that requires a different conclusion. *See In re Marriage of Drexler*, 2013 COA 43, ¶ 27 (noting that appellants bear the burden to provide legal authority in support of their appellate contentions).

¶ 52    Husband also suggests that the court made comments at the sentencing hearing that conflicted with its finding that his conduct was offensive to the authority and dignity of the court. He highlights the court's statements that "there was a level of conflict that was coming from both parties" and that it "wished [it] could award [wife] attorney's fees" for having to engage in this lengthy litigation. However, beyond the conclusory suggestion, he does not explain how these comments affected the court's finding or otherwise warrant reversal. *See In re Parental Responsibilities Concerning S.Z.S.*, 2022 COA 105, ¶ 29 (declining to consider an undeveloped argument).

¶ 53    The court acted within its authority to supplement its contempt findings at sentencing, and its findings were supported by the record.

## IV.    Requests to Stay the Contempt Proceedings

¶ 54    Husband next contends that the district court erred by denying his requests to stay the contempt proceedings. We dismiss this portion of his appeal.

¶ 55    We will not address the merits of an issue that has been rendered moot. *In re Marriage of Tibbetts*, 2018 COA 117, ¶ 7; *see*

24

*also In re Marriage of Thomas*, 2021 COA 123, ¶ 22 (recognizing that a court may raise the issue of mootness sua sponte). An issue is rendered moot when the judgment would have no practical effect on the existing controversy. *Tibbetts*, ¶ 8.

¶ 56    In a prehearing motion and again before the court imposed punitive sanctions, husband asked the court to stay the contempt proceedings until the resolution of his appeal concerning permanent orders. He argued that the district court could sentence him to jail as a punitive sanction and that if the court of appeals reversed the permanent orders, the court's deprivation of "his constitutional liberty" could not be restored. The court denied his requests. And after conducting the contempt proceedings, it sentenced husband to ten days of work crew, and husband has completed that sentence.

¶ 57    Because any decision we now render concerning the propriety of the court's rulings to not stay the contempt proceedings would have no practical legal effect, we conclude that the issues have been rendered moot. *See id.* The district court completed the contempt proceedings, and husband served his sentence. As well, *Collins I* determined husband's appeal of the permanent orders. *See Collins*

*I*, ¶ 88. While his petition for writ of certiorari is currently pending with our supreme court, any potential change to *Collins I* would not change the fact that a stay of the contempt proceedings cannot now be given to husband. We discern no basis to apply an exception to the mootness doctrine. *See In re Marriage of Wiggins*, 2012 CO 44, ¶ 16 n.2 (recognizing an exception may apply when the issue (1) is capable of repetition, yet evading review; or (2) involves a question of great public importance). Nor has husband alleged such a basis.

¶ 58 We thus dismiss this portion of the appeal. *See In re Marriage of Walker*, 264 P.3d 630, 631 (Colo. App. 2011) (dismissing an appeal for mootness).

## V. Appellate Attorney Fees

¶ 59 Husband and wife each request an award of appellate attorney fees under section 14-10-119, C.R.S. 2024, claiming that the other party has superior financial resources. *See Collins I*, ¶ 86. We remand this issue to the district court. *See id.*; C.A.R. 39.1.

## VI. Disposition

¶ 60 We affirm the punitive contempt judgment and dismiss the part of husband's appeal challenging the decision not to stay the contempt proceedings. We remand the case for further proceedings

on the parties' requests for appellate attorney fees under section 14-10-119.

JUDGE DUNN and JUDGE NAVARRO concur